SEABOARD TERMINALS CORPORATION v. WESTERN MARYLAND RY. CO. et al. (MARYLAND TERMINALS CORPORATION, Intervenor).

No. 4525.

Circuit Court of Appeals, Fourth Circuit.

Jan. 8, 1940.

James Thomas, of Baltimore, Md., for appellant.

Hilary W. Gans, of Baltimore, Md. (Eugene S. Williams and William C. Purnell, both of Baltimore, Md., on the brief), for appellees.

Before PARKER and SOPER, Circuit Judges, and DOBIE, District Judge.

DOBIE, District Judge.

This case began in the United States District Court for Maryland with a creditor's petition for the reorganization of the Seaboard Terminals Corporation under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Upon the answer of the debtor corporation and exhibits, the District Court, on March 10, 1939, approved the petition and appointed a temporary trustee. Thereafter, the Western Maryland Railway Company and the Voluntary Relief Department of Western Maryland Railway Company filed their answer as creditors, denying allegations of the petition as to the debtor's ownership of certain property, and asked that the petition be dismissed as not being filed in good faith in that it was unreasonable to expect that a plan of reorganization could be effected. Also, before the first hearing, the Court permitted the Maryland Terminals Corporation (a wholly owned subsidiary of Western Maryland Railway Company) to file an intervening petition in which it asserted its ownership of the property in question, its lease thereof to the debtor, the debtor's default under the lease, and petitioner's desire to exercise its right to reenter and take possession of the property. The trustee, then in possession of the property, filed an answer to the intervening petition denying the right of Maryland Terminals Corporation to terminate the lease.

On April 27, 1939, at the conclusion of its hearings, the District Court dismissed the petition for reorganization of the debtor as not filed in good faith within the meaning of Section 146 (3) of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 546(3), and rescinded its order of March 10, 1939, ap-

proving the petition. By a prior decree the Court had modified this same order, upon a finding that the debtor occupied the property as a lessee and was in default under its lease, to permit the Maryland Terminals Corporation to exercise its rights under said lease without injunction from the Court. From both of these decrees, the Seaboard Terminals Corporation, debtor, appeals.

The disposition of this case in the lower court necessarily turned upon the legal effect given to transactions between the appellant and its principal creditors, Western Maryland Railway Company and subsidiaries, concerning the real estate and improvements upon which appellant was conducting its business at Curtis Creek, Maryland. Consequently, this appellate court, in determining the assignments of error, must consider also the prior dealings and circumstances which throw light on the debtor's condition and which aid in the interpretation of the transactions as to which issue is raised.

During the years 1924 to 1933, the appellant and a subsidiary had engaged in the business of buying gasoline and other petroleum products and selling or marketing the same at wholesale to jobbers and retailers of such products. During a number of years the business was highly profitable, but in 1928 Seaboard Terminals had begun to convey and sell small parcels of its approximately seventy-nine acre tract. Because of an alleged conspiracy existing between producers of gasoline and other petroleum products, the source of supply for these materials became cut off with disastrous financial losses to the appellant. As a result of the situation thus created, in May of 1932 appellant borrowed from the Baltimore Trust Company the sum of $350,000 and, to secure the loan, executed a first mortgage upon its property. Appellant also executed a second mortgage for $33,274.87 to Oil Well Supply Company as security for the payment of the purchase price of certain machinery and plant equipment. Both mortgages matured by their terms on May 2, 1933. At the beginning of the year 1933, appellant's property, subject to these mortgages, consisted of approximately fifty (50.45) acres of land with improvements thereon, including a number of steel storage tanks, a system of pipes and loading platforms, and pipe lines to the pier. After the date of these mortgages, appellant's property was devoted almost exclusively to the storage of gasoline and other petroleum products for other distributors on a gallonage rental charge.

During the first months of 1933, appellant was still in a straitened financial condition and needed ready money with which to meet its pressing situations. In February of that year, the Western Maryland Railway Company submitted an offer to purchase all of appellant's property and equipment at Curtis Creek for $540,000. Since Western Maryland would have to assume the mortgages and various other debts, Seaboard Terminals was to receive only $23,000 to $28,000 in cash. Appellant refused this offer, and it was then withdrawn. Thereafter, appellant asked Western Maryland to lend it $70,000, but appellee was unwilling to accept as security therefor a third mortgage. Negotiations between the president of Seaboard Terminals and the Western Maryland Railway resulted in an agreement dated April 18, 1933, which provided for the sale to Western Maryland, or its nominee, of all appellant's property and improvements, subject to the existing mortgages, for approximately $70,000. The agreement provided also for a lease of this property back to the appellant for a term of five years upon an annual rental equivalent to six per cent of the purchase price plus the amount of taxes, insurance premiums and pier rental. It further provided that appellant should have the option to repurchase the property at the expiration of the term for the same amount plus unpaid rental and the expenditures of Western Maryland on the premises. This agreement was subject to certain conditions, among which were provisions that appellant should obtain extensions of the two mortgages for not less than two years, and that appellant's president should agree not to operate any other gasoline or terminal business within three years from the termination or expiration of the lease, in the event that appellant did not exercise its option.

After the execution of this instrument, appellant obtained an extension of time for the repayment of the principal of both mortgages until May 2, 1935; but the mortgagees required Western Maryland to guarantee payment of both principal and interest on these mortgages. The final outcome was that the agreement was apparently confirmed by the execution of two instruments on May 3, 1933: first, a deed to the Maryland Trust Company, as nominee of

Western Maryland, conveying appellant's property; second, a lease from Maryland Trust to appellant of said property, but excluding a part referred to as the "wharf log". Other conditions of the agreement were embodied in these instruments, and Western Maryland supplied the purchase price, $70,079, to the appellant. On June 10, 1933, Western Maryland caused the Maryland Trust to convey this property, subject to the mortgages and lease, to Maryland Terminals Corporation, a wholly owned subsidiary of the appellee and intervening petitioner in this proceeding.

Under this lease, appellant was to pay the interest on the mortgages and was to prevent any default upon their maturity. But in the fall of 1934, appellant's president told Western Maryland that Seaboard Terminals would not be able to pay the mortgages and asked Western Maryland to buy and extend them. The second mortgage was then purchased by the Voluntary Relief Department of Western Maryland, and later the first mortgage was purchased by Western Maryland. Both mortgages were assigned to other companies, but Western Maryland has always appeared to be in control of them; so, by agreement dated May 2, 1935, the mortgages were extended to May 2, 1938. About this same time, the lease and option were extended to July 31, 1946. The mortgages were not paid in 1938, and foreclosure proceedings on the second mortgage were commenced during January, 1939, in the state court. Seaboard Terminals responded by filing an application for injunction and construction of instruments, and then the creditor's petition was filed in the federal District Court.

Such was the situation between the debtor and its principal creditors when reorganization proceedings were instituted in the federal court. Upon this factual background, we can undertake examination of appellant's contentions and assignments of error on the part of the District Court. The second principal claim raises a question of jurisdiction and will be considered first. Did the Court exceed its jurisdiction in determining the ownership of the property and in modifying its injunction upon the intervening petition of Maryland Terminals Corporation? Appellant contends that the District Court erred in this decree in that the final determination of title to property in possession of the debtor was not within the purview of the first hearing, but that only the bearing which the dispute as to title had on the question of "good faith" could be considered, and that the Court had no jurisdiction to adjudicate questions of title.

We think there was no error in the discerning manner in which the lower court disposed of this matter, and we believe the court had jurisdiction to enter the decree dissolving the injunction against interference with the property. Now, it should be quite evident that the reorganization proceeding simply could not proceed without a determination of the status of the debtor's chief asset, the real estate and improvements with which it conducted, and proposed to continue, its business. This was recognized by the creditor's petition, assented to by the debtor, which raised specifically the issue as to the effect of the absolute conveyance. Even had the question of title not been so raised, any reorganization proposal involving the property concerned bona fide claimants to its ownership, and Maryland Terminals rightfully intervened. Under Section 207 of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 607, a permissive right of intervention is granted, and while this section is seemingly for the benefit of creditors and stockholders, it can hardly be considered a restriction upon the ordinary rules of intervention. In the instant case the intervenor could show an interest in the property which was in the possession of the debtor, and in the custody of the court following the appointment of a temporary trustee. Under old Equity Rule 37, 28 U.S.C.A. following § 723, this was always a ground for intervention; cf. Rhinehart v. Victor Talking Machine Co., D.C.N.J.1917, 261 F. 646; and under the Federal Rules of Civil Procedure, Rule 24, 28 U.S.C.A. following section 723c, now applicable to bankruptcy proceedings by order of the Supreme Court, there is at least a permissive right to intervene. Accordingly, we are not impressed by appellant's argument on this point. The intervention was not an attempt to answer under Section 137 of the Bankruptcy Act, 11 U.S.C.A. § 537, but sought to establish or release the rights of the intervenor under certain specified transactions—the conveyance and lease. This, we think, distinguishes the case of In re 1030 North Dearborn Bldg. Corporation, D.C.Ill.1934, 7 F.Supp. 896 (decided under 77B, 11 U.S.C.A. § 207), which denied an intervening petition that not only asserted ownership but controverted the allegations of the petition

for reorganization and sought to have it dismissed.

As has already been observed, the status of the property with respect to the lease was inextricably bound up with the status of the property with respect to any reorganization plan. And if reorganization proceedings were to be considered, ownership of the property had to be determined one way or the other. That the District Court was able to do this at the conclusion of the first hearing was commendable, and that this decision was also decisive of the intervening petition for modification of the Court's injunction was not error. With all parties in interest before the Court, and the property in the Court's custody, there was no lack of jurisdiction and no prejudice of any substantial rights. We note, too, that at the time when the issue of ownership might have been decided either way, the debtor did not challenge the Court's jurisdiction to determine the question of title. Finally, it may be observed, in its decree on the intervening petition, the District Court limited its adjudication to the points raised by the petition. Cf. First Nat. Bank v. Conway Road Estates Co., 8 Cir., 1938, 94 F.2d 736. But, had the Court limited its hearing solely to the question of the possible bearing which the evidence adduced by the intervenor had on the question of "good faith" of the creditors' petition, it is questionable whether anything substantial could actually have been decided.

It is the determination of the lower court of the issue as to ownership and status of the property that forms the basis of appellant's principal claim—that the Court erred in dismissing the petition for reorganization as not having been filed in good faith, i.e., with a reasonable expectation that a plan of reorganization could be effected. Appellant contends the Court erred in its conclusions upon which the decree was based: one, that the deed and lease between the debtor and Maryland Trust Company, executed May 2, 1933, were absolute conveyances according to their respective terms, and not a conveyance of the same as security for a debt; two, that the first and second mortgages were overdue and in default.

As to the proposition that the legal effect of the absolute conveyance was to create a mortgage, it is, of course, "an established doctrine that a court of equity will treat a deed, absolute in form, as a mortgage, when it is executed as security for a loan of money". Peugh v. Davis, 1877, 96 U.S. 332, 336, 24 L.Ed. 775. But a corollary to this doctrine is equally fundamental: "the parol evidence that there was a debt, and that the deed was intended to secure it and to operate only as a mortgage, must be clear, unequivocal, and convincing, or the presumption that the instrument is what it purports to be must prevail". Coyle v. Davis et al., 1885, 116 U.S. 108, 112, 6 S.Ct. 314, 316, 29 L.Ed. 583. The party who asserts that the deed was given to secure a debt has the burden of proving it by evidence that is clear, unequivocal and convincing. Streeter Construction Co. v. Kenny, 1924, 209 App.Div. 697, 205 N.Y.S. 611. We are satisfied from the record that appellant did not meet this burden, and that the District Court did not err in its decision.

In favor of appellant's contention is, first, the testimony of its president and some of his letters stating his view that the transactions constituted a mortgage and not a sale. Secondly, the transactions resulted from appellant's desire and request for a loan of $70,000. Thirdly, the rental provisions in the lease were based on a percentage of the sum involved, and also required appellant to pay the amounts of taxes and insurance premiums. Against this contention and in support of the Court's conclusion is the prime fact that the record discloses no shred of evidence that the transactions produced a debt—a loan of money which would have to be repaid. While the failure of a creditor to take a personal obligation from the debtor does not conclusively preclude the possibility of a mortgage; yet, in such a case, both parties must have understood a debtor-creditor relationship as existing, and both parties must really have intended to provide a security for a loan. All of the testimony is to the effect that the Western Maryland Railway never regarded the transaction as anything but a sale, and that many attorneys for appellant considered that the fee of the property had been sold and that no equity remained in the appellant. Furthermore, in all subsequent instruments, even with third parties, appellant acknowledged that it held the property as tenant; and in the preliminary agreement to the deed and lease, the intention to sell was definitely expressed. In some jurisdictions the existence of such a written prior memorandum (here a formal instrument) is regarded as conclusive, and parol evidence is

not admitted, Bilbo v. Ball et al., 194 Iowa 875, 188 N.W. 753; see note, 111 A.L.R. 448, 459; though in the instant case we think parol evidence was properly admitted with regard to the transactions.

■ Another important fact, which cannot be overlooked, is that not only was Western Maryland never willing to make a loan, according to testimony of its representatives, but it already had, when it agreed to the deed and lease arrangement, refused to lend money to the debtor and to take as security for such a loan a third mortgage on the property. Western Maryland intended to buy the property, and the debtor's conditional option to repurchase, with no obligation to repay, could not convert the transaction into a security arrangement. Precisely such was the situation in Youssoupoff v. Widener, 1927, 246 N.Y. 174, 158 N.E. 64, where a contract had been made to sell certain pictures after a loan had been refused; and the court denied defendant's contention that his conditional contract right to repurchase constituted an equity to redeem the alleged pledge. There were other conditions in the instruments and other testimony which support the presumption of an absolute sale and militate against the mortgage theory; but in the light of our view, we do not believe that these facts need be set out or discussed. We think the District Court reached a correct conclusion of law, and deem it unnecessary to discuss further the evidentiary value of the various provisions in the instruments.

■ Appellant claims the lower court erred in its conclusion that the first and second mortgages were overdue and in default. Appellant maintains that in April, 1938, Western Maryland agreed, orally by its attorney who was a vice-president, to an extension of the mortgages until 1946 when the supplemental lease would have expired. Western Maryland denies any such agreement, and maintains that it notified appellant it would require payment of the mortgages at maturity and that a default occurred on May 2, 1938, although it carried the mortgages on a demand basis for a reasonable time thereafter. Appellant's contention is based upon an alleged oral agreement to extend and a memorandum proposing to confirm an extension. However, neither this nor any other written agreement was signed by any of the officers of Western Maryland; whereas, all prior extensions and other transactions between the parties had been accomplished by the execution of formal papers. Contrary to appellant's argument, it does not seem to have been reasonable for it to rely upon a verbal commitment during negotiations of an officer not authorized alone to make a binding written agreement. Suffice it to say here that the District Court found that the mortgages matured on May 2, 1938, and were in default—"I do not think there has been any legal extension of these mortgages. Therefore, the fundamental fact that we are confronted with is that they are overdue, they are unpaid." With this finding of fact we can only, and are disposed to, agree; we need not consider the legal question of whether there could have been an oral extension of the written instruments.

■ There remains only the formal question of whether the District Court erred in its finding that "it is unreasonable to expect that a plan of reorganization can be effected and that therefore said petition was not filed in good faith". The determination of the lower court is one of fact and will not be set aside unless clearly erroneous. Wayne United Gas Co. v. Owens-Ill. Glass Co., 4 Cir., 1937, 91 F.2d 827, 831. The disposition of the questions raised, confirming the District Court, leaves the appellant with no property that could be made the basis of a reorganization. Also, appellant's losing financial struggles over the last ten years, its debt accumulation despite attempts to raise additional needed capital, all of which were considered in the oral opinions of the court below, where the possibilities were fully considered, convince us that appellant could not have, with any show of reason, entertained more than a forlorn hope of refinancing. We are convinced that there was no error in the decision of the lower court.

For the reasons stated, the decrees appealed from will be affirmed.

Affirmed.