**In re NORTH AMERICAN RENTAL, Debtor.**

**NORTH AMERICAN RENTAL, Plaintiff,**

**v.**

**FIRST SOUTHERN LEASING, LTD., Defendant.**

**Bankruptcy No. 85–376.**
**Adv. No. 85–59.**

United States Bankruptcy Court, D. New Hampshire.

Nov. 8, 1985.

As Amended Nov. 13, 1985.

Victor Dahar, Manchester, for plaintiff/debtor.

Richard Snierson, Manchester, for defendant.

## MEMORANDUM OPINION

### [Amended]

JAMES E. YACOS, Bankruptcy Judge.

This matter was tried over a three day period and involves the effort of the Chapter 11 debtor to recover a number of substantial items of heavy machinery equipment which were repossessed by the defendant several weeks before the filing of the petition in this court. The adversary proceeding was originally commenced by a "Complaint For Approval Of Assumption Of Executory Contracts And To Compel Turnover Of Property" filed herein on August 26, 1985 by the debtor. This complaint asserts that the "equipment leases" in question covered items of machinery crucial to its business operation which were wrongfully repossessed by the "lessor" defendant. The complaint sought recovery of the same with concurrent assumption of the executory contracts by the now debtor-in-possession pursuant to § 365 of the Bankruptcy Code.

On August 30, 1985 the debtor amended its complaint to include an additional Count II alleging in the alternative that the leases in question were really installment sales contracts in fact and—being unperfected by any UCC–1 filing—were ineffective to give the defendant any enforceable security interest in the machinery in question. On this basis, the debtor sought an outright order directing turnover of the machinery by the defendant with the defendant to be left as an unsecured creditor in these Chapter 11 proceedings.

After the taking of extensive evidence on both Counts I and II of the debtor's complaint it is crystal clear that with regard to Count I, i.e., the effort to assume the contracts as leases under § 365 of the Bankruptcy Code, that Count I cannot be sustained because it has been established beyond any question that the debtor-in-possession has no ability to promptly cure the substantial arrearages in contract payments which existed as of the time of the repossession of the equipment by the defendant. Such prompt cure of default is mandated by § 365(b)(1)(A) of the Bankruptcy Code. In addition to monthly payment arrearages in excess of $34,000 the debtor would also have to compensate the defendant for "actual pecuniary loss resulting from such default" amounting to $4,851.69, as specified in § 365(b)(1)(B) of the Code and the contracts here involved.

The crucial issue then becomes whether the debtor is entitled to any relief under Count II of its complaint, i.e., the assertion that the leases involved were not "true leases" at all and therefore are void as unperfected security interest transactions.

Here again extensive evidence was received establishing that the contracts in question did differ from what might be termed "operational leases" in which the lessor maintains the equipment, insures it, and generally just provides the use of the equipment to the lessee on a day to day or a month to month basis. The defendant's own witnesses referred to these contracts as being "finance leases" in which all obligations of maintenance and repairs, insurance, etc., were imposed upon the lessee. In addition, the lessor required that the acquisition of the equipment in question—to be selected by the lessee—be done through specified equipment dealers who were required to guarantee to the lessor the performance of the lessees under the contracts. The dealer's price for undertaking this guarantee obligation was in effect added to the acquisition cost of the machine involved and was used by the lessor in determining appropriate lease payments and the ultimate "balloon" option price under the contract by which the lessor would recover its entire investment in the equipment together with a 25 to 30 percent after-tax profit return.

Notwithstanding the foregoing differences from a normal "operating" equipment lease transaction, the fact remains that ownership and title to the machinery remained in the defendant and that the debtor could only obtain ownership by exercising an option to purchase which required substantial consideration to be paid by the debtor. The option purchase prices on 9 of the 11 contracts were in excess of twenty-five per cent of the original acquisition cost of the machine in question; and the remaining 2 contracts had option prices in excess of twenty-one per cent of the original acquisition cost.[1]

Viewed solely as a question as to whether these contracts were "true leases" or "security transactions" subject to the recording and notice requirements of the Uniform Commercial Code, Article 9, the conclusion must be that these contracts were true leases inasmuch as it cannot in any sense be said that the debtor was obligated to purchase the equipment in question by payment of the total lease payments plus a nominal purchase option price. See RSA 382–A: 1–201(37) (1983 Supp.)

Under RSA 382–A:1–201(37) (1983 Supp.), "Unless a lease ... is intended as security, reservation of title thereunder is not a security interest ..."

Under RSA 382–A: 9–102 (1983 Supp.), with the exception of certain excluded transactions not applicable here, the provisions of Article 9 of the UCC concerning secured transactions, apply "to any transaction (regardless of its form) which is intended to create a security interest in personal property ..." and apply "to security interests created by contract including ... [a] lease ... intended as security".

Plainly, the touchstone of the inquiry is whether the parties to an agreement *intended* a security interest. As stated in the Uniform Laws Comments to original § 9–102:

> ... the principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? ... Transactions in the form of ... leases are subject to this Article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended ... When it is found that a security interest as defined in Section 1–201(37) was intend-

---

1. Each of the eleven leases expressed the purchase option price as "fair market value not to exceed [a specific dollar amount]". The evidence concerning the fair market value of the various pieces of equipment in August of 1985 established that the maximum option price or "cap" would have been applicable in each instance because the fair market value at that time exceeded the "cap" price. Due to heavy demand for used heavy equipment in New Eng-

land the evidence indicates that the fair market values of the machines in question are still close to the level of the original acquisition cost. While the fair market value obviously could decline during the remaining terms of the leases (two years average) the debtor's own value evidence indicates that there would be sufficient fair market value at the end of each lease so that ownership could only be obtained by paying the "cap" option price.

ed, this Article applies regardless of the form of the transaction or the name by which the parties may have christened it . . .

"Whether a lease is intended as security, is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security." RSA 382–A: 1–201(37) (1983 Supp.).

In the instant matter, each "lease" in question does include an option to purchase. However, as noted above, all effective purchase option prices (using the maximum or "cap" option price) are substantial in amount. Hence such purchase option prices cannot be termed "nominal consideration" and the instant "leases" are not security transactions as a matter of law. See *In Re Wheatland Electric Products Co.*, 237 F.Supp. 820 (W.D.Pa.1964) (when the lessee must pay 25 percent of list price, regardless of amount of payments he already made as rentals, the option to purchase required substantial consideration and therefore lease was not a security agreement); *Peco Inc. v. Hartbauer Tool & Die Co.*, 262 Or. 573, 500 P.2d 708 (1972) (a finding of an option to purchase for nominal or no consideration must, as a matter of law, result in the conclusion that the transaction is a secured transaction and not a lease).

It is true that the fact that a substantial payment is to be made by the lessee does not preclude finding that the transaction was intended as a security interest where other elements of the case justify that conclusion. 1 Anderson, *On the Uniform Commercial Code* § 1–201: 272 (3rd ed. 1981); *Re: General Assignment for Ben. of Creditors of Merkel, Inc.*, 45 Misc.2d 753, 258 N.Y.S.2d 118 (1965) rev'd on other grounds, 25 App.Div.2d 764, 269 N.Y.S.2d 190 (1966).

Indicia other than the amount of consideration paid, which are examined in order to discriminate leases from security interests include for example, a clause providing for "interest payments", which tends to make the deal look like a secured sale. See e.g., *In re Royer's Bakery, Inc.*, 1 UCC Rep.Serv. 342 (Ref.Dec.E.D.Pa.1963). Also, if a clause gives the lessor the right on default to accelerate all further payments under the lease, the deal looks more like a secured sale. See e.g., *In re Pomona Valley Inn*, 4 UCC Rep.Serv. 893 (Ref. Dec.C.D.Cal.1967). Further, if the lessor is not a true lessor of such goods, but rather is a financer, this makes the deal look more like a secured sale. See, e.g., *In re Transcontinental Indus., Inc.*, 3 UCC Rep.Serv. 235 (Ref.Dec.N.D.Ga.1965).

While in the instant case, defendant's own witness referred to these contracts as "finance leases", other elements or indicia do not justify finding that these contracts were intended as security interests. Under the contracts in question, the debtor's payments were denominated as "rent" (¶ 2 of all leases); debtor was required to make a "security deposit" which is less than the amount that would have been required for a down payment on a purchase (¶ 5 of all leases); and debtor was required *to return the equipment* at the end of the agreement in good condition (¶ 10 of all leases). Further, the "leases" provided that:

> Title to the equipment shall at all times remain in [defendant] *unless transferred to [debtor] by sale* . . . (emphasis added) (¶ 28 of Lease # 6; ¶ 27 of all other leases).

In the present case the evidence clearly establishes that the debtor had a perfect right to turn back the property to First Southern Leasing at the end of the contract terms without having in effect paid the entire value of the machine in question.

Finally, the leases provided that debtor would use any markings supplied by First Southern *stating that the equipment was the property of First Southern* (¶ 3 of all

leases).[2] Thus, in the instant matter, not only the amount of consideration required as the purchase option price, but also an examination of other factors compels the conclusion that the agreements in question are true leases rather than security agreements. 1 Anderson. 1 Anderson, *On the Uniform Commercial Code* §§ 1–201: 248, 250, 251, 252, and 259 (3rd ed. 1981).

The failure of the debtors' UCC attack does not however dispose of all possible grounds for attack upon the defendant's claim to the machines in question. An equipment lease found to be a "true lease" still remains a bailment for hire subject to various common law rules which may result in loss of the bailor-owner's rights in the chattels in certain circumstances. See 8 Am Jur 2d *Bailments*, § 39 (1980); 67 Am Jur 2d *Sales* § 37 (1985). A bailor who stands by and allows his bailee to mislead creditors with regard to the property bailed can be held to be estopped to thereafter assert ownership of the property in question. *Thompson v. Sanborn* 11 N.H. 201 (1840); 8 Am Jur 2d *Bailments* § 102 (1980). Moreover, a bailor that permits a bailee to use personal property in the bailee's business in a misleading fashion, i.e., allowing the bailee to put his own "name or brand" on the property, may find himself estopped to assert ownership as against misled creditors or other innocent parties. See 8 Am Jur 2d *Bailments*, § 103 (1980); *First National Bank v. Kissare*, 22 Okl. 545, 98 P. 433 (1908); *O'Connor's Adm'x v. Clark*, 170 Pa. 318, 32 A. 1029 (1895).

In the present case however, apart from a great deal of rhetoric and colloquy of counsel, no substantial evidence was introduced to establish that the defendant took any affirmative actions to mislead creditors extending credit to the debtor into believing that the debtor owned the machinery in question. There is not even any evidence that the defendant "stood by" and allowed the debtor to use markings or decals upon the machines in question which would have misled creditors into believing the debtor owned the equipment. Accordingly, the evidence simply does not establish that the defendant can be held responsible for the creation of any indicia of ownership on the part of the debtor with regard to the heavy machinery it used in its operations. *Cf., Mabe v. Dillon*, 46 N.C. App. 340, 264 S.E.2d 796 (1980). In the absence of any such misleading "representations" attributable to the defendant, any creditor extending to the debtor in its operations could not contend that it was diverted from appropriate inquiry in the circumstances, i.e., requesting the debtor to exhibit titles or other evidences of ownership of its operational equipment.

Accordingly, in accordance with the foregoing findings of fact and conclusions of law, the plaintiff/debtor is not entitled to any relief on either count of the complaint and a separate judgment dismissing the complaint shall be entered.

---

**2.** There is no evidence in the record as to whether any such decals were in fact supplied and used on the machines.