In re OMNE PARTNERS II, Debtor.

Michelle CHICOINE, Daniel Courchesne Christopher Karr, David Jones and Robert M. Morin, Jr., Trustees of the Northern New England Carpenters' Pension Fund, Plaintiffs,

v.

OMNE PARTNERS II and City of Portsmouth, Defendants.

Bankruptcy No. 86–117.
Adv. No. 86–34.

United States Bankruptcy Court,
D. New Hampshire.

Dec. 3, 1986.

Mark Vaughn, Manchester, N.H., for City of Portsmouth.

Martha Smith, Nashua, N.H., for OMNE.

Peter Rotch, Manchester, N.H., for Abcus Mortg.

Whitton Norris, Peabody & Brown, Boston, Mass., for debtor.

J. Michael Deasy, Nashua, N.H., for Northern N.E. Carpenters Fund.

George Burns, Portland, Me., for Consolidated Construction Builders of N.H. Inc.

Lou Robin, Goldstein & Manello, Boston, Mass., for Goldstein & Manello.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding brings before the court the question of the characterization and present status of a real estate transaction involving the "OMNE Mall" located in Portsmouth, New Hampshire. The debtor-defendant operates and manages this "Factory Outlet" discount mall facility.

On March 20, 1986 the debtor filed a Chapter 11 petition seeking reorganization relief in this court. On April 7, 1986 the plaintiffs, hereinafter referred to as the "Pension Fund" or "Fund", filed a complaint seeking a determination as to their rights to possession of the property and its rents, and for other relief.

The Fund takes the position that it effectively terminated the debtor's rights as lessee under the underlying ground lease of the mall property prior to the bankruptcy filing, and that the debtor has wrongfully refused to vacate the property and to return control and possession of the same to the Pension Fund as the owner under a terminated lease.

The debtor answered and denied that its rights had been effectively terminated prior to the bankruptcy. The debtor also counterclaimed for a declaratory judgment that the transaction in question was not a true lease at all, but rather was a disguised financing transaction under a "sale-and-leaseback" in which the Pension Fund should be viewed as merely a mortgagee-lender regarding the property.

The City of Portsmouth, which provided some of the funds required to put the mall in operation, took as part of its collateral a security interest in the lease in question, and has been permitted to intervene as a party defendant and joins with the debtor in challenging the assertion by the Pension Fund that the lease had been terminated prior to bankruptcy. The City also apparently joins in the debtor's contention that the transaction in question was a financing arrangement rather than a lease, but couples this contention with the further request that this court "validate the interest of the intervenor as a mortgagee on the premises referred to in the agreement."

By agreement of the parties this adversary proceeding has been split into "First Trial" and "Second Trial" phases. The "First Trial" phase, involving an evidentiary hearing on October 24, 1986 and a further oral argument hearing on November 21, 1986, deals solely with the question of the characterization, or recharacterization, of the real property transaction in question. Left for the "Second Trial" phase is the separate question as to whether the lease, if that is what it is determined to be, was terminated prior to bankruptcy.

The evidence submitted indicates a multi-party transaction for development and operation of the Portsmouth mall property. In round numbers, the debtor was required to obtain a total of $12,600,000 in funding for the project. This included $3,000,000 from the limited partners of the debtor and 2,100,000 from the City of Portsmouth as its part of a HUD grant for industrial development. The debtor also obtained $4,800,000 from a construction lender for the mall improvements and $2,700,000 from

the Pension Fund under the transaction here in issue.

The transaction with the Pension Fund was closed on May 1, 1984, under a sale-leaseback in which the debtor transferred the land to the Fund and the trustees of the Fund executed a 30–year ground lease to the property back to the debtor. Under the agreement, the debtor deeded the property to the Fund for a sale price of $1,000,-000, and the Fund agreed to make additional site improvement advances up to 1.5 million dollars concerning the mall. This amount was later increased to 1.7 million dollars. The ground lease is what is commonly referred to as a "triple net lease" transaction in which the lessee obligates itself to pay certain taxes, charges, costs and expenses attributable to the property which otherwise would be born directly by the owner-lessor.

The debtor's chief contention is that it bore all the normal obligations of ownership and that the "rental payments" provided under the lease transaction were admittedly defined in terms of the recovery by the Pension Fund of its investment into the transaction. This, the debtor says, establishes that the economic substance of the transaction was simply secured financing. The debtor argues therefore that it should be declared to be the "owner" of the property, notwithstanding the recorded deed showing the Pension Fund as owner, and the recorded lease showing the debtor as lessee. The debtor also raises a number of additional facets of the lease transaction which it contends adds to this "economic substance" argument. The Fund contends that a number of other facets of the overall transaction negate the debtor's argument. However, for reasons which appear below in my discussion of the "intent factor", it is unnecessary to go into all of these contentions in detail for present purposes.

It is well established that a bankruptcy court, as a court of equity, may "look through form to substance" in determining the true nature of a transaction relating to rights of parties against a bankruptcy estate. *Pepper v. Litton,* 308 U.S. 295, 304,
60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *Lord's, Inc. v. Maley,* 356 F.2d 456 (7th Cir.1965); *In re Transystems, Inc.,* 569 F.2d 1364 (5th Cir.1978); *In re Nite Lite Inns,* 13 B.R. 900 (Bankr.S.D.Ca.1981); *Fox v. Peck Iron & Metal Co.,* 25 B.R. 674 (Bankr.S.D.Ca.1982). *Cf. also, In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981).

In the context of sale-leaseback realty transactions, however, this power should be exercised only upon a showing by "clear and convincing evidence" by the debtor that the transaction should be deemed a disguised financing transaction. *Fox v. Peck Iron & Metal Co., supra,* at p. 688. *See also Seaboard Terminal Corp. v. Western Maryland R.R. Co.,* 108 F.2d 911 (4th Cir.1940). Moreover, the intent of the parties in the transaction is factually the key issue in such cases. *Matters of Kassuba,* 562 F.2d 511 (7th Cir.1977); *Fox v. Peck Iron & Metal Co.,* supra at p. 688.

It is also important to identify the purpose relevant to the Bankruptcy Code for which the characterization is being made. In the present case the characterization is relevant because it will determine whether the debtor can seek to realize an "equity of redemption" in the property, as it would be able to do as a mortgagor-borrower, by virtue of the confirmation of a reorganization plan, with or without a "cramdown" provision, as provided in § 1129 of the Bankruptcy Code.

On the evidence presented I conclude that the debtor has failed to meet its burden of clear and convincing evidence that the transaction in question was understood by the parties, and had the economic substance, as being a disguised financing transaction rather than the lease transaction it purported to be. There is no question that these parties, both being sophisticated in such complex financing transactions, negotiated and intended the transaction to be a lease rather than a loan transaction.

The debtor in fact first approached the Pension Fund *on the basis of* a loan trans-

action with regard to its mall project. In November of 1982 the debtor asked the Fund to consider a construction loan for the project. The Fund rejected that request the same month and indicated that it did not wish to get involved in any construction lending. At that time the Fund had a dispute with the Department of Labor regarding its involvement in construction loans involving union labor.

In December of 1982 the debtor replied to this rejection by suggesting that perhaps a sale-leaseback transaction could be structured for the project. The debtor's representatives met with the Fund trustees in January of 1983 with regard to this proposal. The trustees of the Fund at that meeting indicated their reluctance to consider this alternative proposal but agreed to further negotiations. These negotiations went on throughout 1983 and it was not until November of 1983 that the Pension Fund finally agreed to the transaction in question. As part of that transaction the debtor was required to give its opinion of counsel that the Fund would receive good title as owner of the property from the debtor, and that the Fund would be provided appropriate title insurance written by the debtor's attorney as agent to protect the Fund's interest as owner of the property.

On this showing I find that the debtor understood that it was important to the Pension Fund that the transaction in question be accomplished through a sale-leaseback rather than a construction loan, and that the debtor agreed to that structuring of the transaction. It also appears clear that if the debtor had broached the concept that it should have some "protection for its equity from foreclosure" in the transaction, the Pension Fund would not have agreed to go forward. The debtor actually did not bring up the matter in the negotiations.

There is likewise no evidence to support a finding that a disguised financing transaction was involved. Obviously, the deed of ownership to the Pension Fund was on record, for all interested parties to see, as was the lease with all its terms and conditions. No misleading of creditors dealing with the debtor, which was a concern of this court involving an equipment lease transaction, in *In re North American Rental*, 54 B.R. 574 (Bankr.D.N.H.1985), or an ownership claim to the "technology" of a computer company, in *In re Bedford Computer Corporation*, 61 B.R. 594 (Bankr.D.N.H.1986), is involved in the present case.

A case with very similar facts to the present case appears in *Matters of Kassuba*, 562 F.2d 511 (7th Cir.1977). The Court of Appeals for the Seventh Circuit there held that a recharacterization of a sale-leaseback transaction was properly denied. The Court emphasized that many of the "economic substance" factors are relevant only when the intent of the parties is disputed. *Id.*, at p. 514.

The court of appeals in the *Kassuba* decision also made the following comment pertinent to the "equity of redemption" argument being made by the debtor in the present case:

Thus, the parties by contract, may create a set of mutual economic benefits that is similar to a mortgage without conferring on each other the rights and liabilities of judicial foreclosure, if that is what they actually intend. The substance of the transaction that a court of equity will examine is not its economic effect, which the parties determine by their agreement, but instead it is what their agreement is. What would be a contract case at law remains in equity a contract case.

The same emphasis on the intent of the parties appears in the decision of the Court of Appeals for the Fourth Circuit in *Seaboard Terminals Corp. v. Western Maryland R.R. Co.*, supra, at pp. 915–916.

I am aware that some courts have downplayed the importance of the "intent factor" in these recharacterization situations. To some extent, it can be argued that it is logically inconsistent to say that the characterization of a commercial transaction depends upon the intent of the parties and yet also say a court of equity can look through form to the economic sub-

stance of the transaction. I do not believe however that bankruptcy judges have a warrant from Congress to run roughshod over the economic landscape recharacterizing commercial transactions entered into by sophisticated parties—restating them in terms of their "economic substance" contrary to their negotiated and agreed form—in the absence of some *triggering factor* permitting such recharacterization, i.e., an actual ambiguity in the documentation, a substantial factual dispute as to the intent of the parties, or some "disguise" or "misleading" aspect to the transaction.

I also find some comfort for this approach in the Supreme Court's decision in the analogous tax avoidance/recharacterization situation in *Frank Lyon Co. v. United States*, 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). In that case a state bank which could not finance a new building by conventional mortgage or other financing, due to various state and federal regulatory requirements, entered into a sale-leaseback agreement with the Frank Lyon Company. The Court of Appeals for the 8th Circuit held that the tax commissioner had correctly determined that Lyon was not the true owner of the building and was not entitled to claimed tax deductions as an owner. It likened ownership to "a bundle of sticks" and concluded after reviewing the net lease transaction involved that Lyon "totes an empty bundle of ownership sticks." 536 F.2d 746, 751 (1976).

The Supreme Court in *Frank Lyon* reversed, concluding that the transaction was not a sham transaction, notwithstanding the fact that the lease rental payments were defined in terms of recovering the investment made into the property by the Frank Lyon Company. The Court commented:

It is true, of course, that the transaction took shape according to Worthen's [the lessee bank's] needs. As the Government points out, Worthen throughout the negotiations regarded the respective proposals of the independent investors in terms of its own cost of funds. E.g., App. 355. It is also true that both Worthen and the prospective investors compared the various proposals in terms of the return anticipated on the investor's equity. But all this is natural for parties contemplating entering into a transaction of this kind. Worthen needed a building for its banking operations and other purposes and necessarily had to know what its cost would be. The investors were in business to employ their funds in the most remunerative way possible. And, as the Court has said in the past, a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred. [435 U.S. at 576, 98 S.Ct. at 1299]

The Supreme Court in *Frank Lyon* also made the following pertinent commentary as to sale-leasebacks as essentially new, hybrid real estate transactions: "As is clear from the facts, none of the parties to this sale-and-lease-back was the owner of the building in any simple sense."

For all of the foregoing reasons I conclude that the debtor must be denied its attempt to recharacterize the transaction herein question. A separate judgment to that effect will be entered. This leaves for determination at the "Second Trial" the question of whether the leasehold interest of the debtor was effectively terminated pre-bankruptcy by the lessor Pension Fund.

## FINAL JUDGMENT

### [First Trial]

This matter having been tried separately before the court, by agreement of the parties, on that aspect of the instant adversary proceeding relating to the characterization or recharacterization of a certain sale-lease-back transaction between the plaintiff Pension Fund and the debtor OMNE Partners II, defendant; and the court having entered its findings and conclusions thereon in its Memorandum Opinion filed this date, and incorporating the same herein by reference; it is accordingly

ORDERED, ADJUDGED and DECREED as follows:

1. The Ground Lease entered into on May 1, 1984 between the aforesaid plaintiff and defendant is hereby declared to be a lease transaction.

2. The request by the debtor-defendant in its counterclaim seeking a recharacterization of the lease in question as not a true lease but one intended as security, and declaring the debtor to be the true owner of the lease premises subject to a lien in favor of the plaintiff, is hereby denied.

3. Each party shall bear its own fees and costs.