**In re BEDFORD COMPUTER CORPORATION and Bedford Research Corporation, Debtors.**

**BEHR VENTURE PARTNERS, LTD.—1983, Plaintiff,**

**v.**

**BEDFORD COMPUTER CORPORATION and Bedford Research Corporation, Defendants,**

**BEHR Venture Group, Ltd.—1983 and BEHR Venture Management Corporation, Third-Party Defendants.**

**Bankruptcy Nos. 85–493, 85–494. Adv. No. 85–115.**

United States Bankruptcy Court, D. New Hampshire.

June 30, 1986.

Robert Hinkley, Manchester, N.H., Joseph Ryan, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for debtors.

Jacob Esher, Riemer & Braunstein, Boston, Mass., for Creditors Committee.

William Gannon, Manchester, N.H., for Merchants Bank.

J. Christopher Marshall, Manchester, N.H., John Sturgeon, Los Angeles, Cal., for plaintiff.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

This adversary proceeding raises the question as to who owns the "technology" of the Chapter 11 debtor corporations—more particularly when it was acquired by the owner—and finally and most importantly just what "it" is.

During a trial spanning two weeks on this matter the court was forced to "pass through the viewing screen" into a totally alien world of computer engineering and business terminology in which the conventional and comfortable concepts of "tangibles" and "intangibles" no longer have much meaning. Having "interfaced" for some weeks with a mountain of esoteric evidence in this strange world, the court reemerges at long last with its decision.

The significance of the word "Opinion" at the top of this decision takes on new meaning as the undersigned judge reflects upon his bruising encounter on the other side of the screen with the assorted Floppies, Stick-Figures, CPU's CRT's BIG's, PIX's, WMK's RIP's and BITBLT's that exist in a new dimension involving "real time" in that dark and shadowy realm. As the evidence indicates, these strange creatures are wont to converse in "C–Language" over an Ethernet using "source codes" and "object codes" to "rasterize" into being "true fonts" with merged text and graphics wonderous to behold.

## PARTIES INVOLVED AND PROCEDURAL CONTEXT

The defendant and debtor, Bedford Computer Corporation (hereinafter "Bedford" or "BCC"), is a publicly-held New Hampshire corporation. It has engaged in the development, manufacture, and marketing of "real time" computer text and graphic composition systems. These systems are used primarily by financial and legal printers, and businesses with in-house typesetting requirements.[1] Prior to the Chapter 11 filing on November 13, 1985 Bedford's systems, described generally as the "Vision Network System" and various component "Meteor" computer systems, were generally recognized as being among the most sophisticated, state-of-the-art systems for these applications.[2] Bedford has manufactured and sold electronic pre-press composition and editing hardware and software since about 1977.

The defendant and debtor, Bedford Research Corporation (hereinafter "BRC"), was organized in late 1983 in conjunction with a series of research and development contracts entered into by Bedford with BEHR Venture Partners Ltd.—1983 (hereinafter "BEHR"), a California limited partnership, and the plaintiff in these proceedings.

BEHR was organized by (and derives its name from) the Los Angeles firm of Bateman, Eichler, Hill, Richards, Inc., a brokerage and investment banking house. The

---

1. The reference to "real time" really has nothing to do with "time" as such. It simply means the Bedford systems, unlike those many of its competitors, were able to be display "the whole page" being worked on as it would actually appear in print, without distracting computer signals and commands. Moreover, the Bedford "Meteor 3000" system at the end of 1983 was reaching the point of achieving capability of providing display in "true font" format, i.e., in the actual type style that would be used. This latter capability however had not been refined to the point of actual marketing by that time.

2. A pictorial representation of the "Vision Network System" as it existed in early 1984 is included in Appendix I to this Opinion. This representation is taken from a sales brochure of that time received in evidence as Plaintiff's Exhibit 29a. A more detailed discussion of the "Vision Network System" appears in the "Item 1-Business" section of BCC's Form 10-K Report to the SEC for the year ending December 31, 1984. This portion of the Report, taken from Plaintiff's Exhibit 35d, is attached as Appendix II to this Opinion.

actual organization and inter-relationships between the various California partnerships and corporations is much more complicated, but it will suffice to refer only to Bateman and BEHR in the present context.

BRC was organized as a wholly-owned subsidiary of BCC, in October of 1983, and executed four separate series of research and development contracts, together with related subsidiary agreements, with BEHR providing for the development of four new products described as a digital scanner, an image generator, a graphics work station, and a word processing work station. BEHR was organized to take advantage of § 174 of the Internal Revenue Code, which in effect provides "tax shelter" benefits to investors in such partnerships to encourage investment in development of new products and technology.

All of the research and development contracts were identical, as were the subsidiary agreements, with the exception of the description of the particular "new product" involved. Under the entire package of agreements, BEHR as of December 31, 1983 committed itself and did over a period of time advance a total of $6.6 million to BRC.

At the time of the Chapter 11 filing, on November 13, 1985, neither BCC nor BRC had delivered to BEHR any completed new products nor had BEHR received delivery of any "hard copy" or "magnetic media" embodiment of any new technology developed by BRC with regard to the new products.

On December 23, 1985, BEHR filed the present adversary complaint against BCC and BRC requesting a declaratory judgment regarding "ownership of property in the possession of the debtor" and reclamation of "property in the possession of the debtor." The complaint also requests related injunctive relief.

The debtors responded on February 24, 1986 with an amended answer, counterclaim and third party complaint, which denied BEHR's claims of ownership on various grounds and affirmative defenses. The debtors alternatively requested author-ity to reject the research and development contracts in question, as being executory contracts burdensome to the estate in reorganization, and therefore rejectable under § 365 of the Bankruptcy Code. The debtors also sought affirmative relief by counterclaim, involving other alleged causes of action against the plaintiff, and against certain related BEHR entities brought into the action on the third party complaint.

As a result of a series of pre-trial conferences and orders this adversary proceeding has been split into "first trial" and "second trial" phases. The first trial has been limited to the questions of ownership and rejection, i.e., all of the debtors' affirmative defenses except the fourth defense and Count VIII of the debtors' counterclaim. The present decision of the court accordingly relates only to the "first trial" which was conducted during the period of April 17, 1986 through April 25, 1986.

## CONTRACTUAL AGREEMENTS AND RELATED FACTS

Before getting into the detail of the contractual arrangements between the parties, the court finds first that it is appropriate to refer to those parties as simply "BEHR", on the one side, and "Bedford" (including both BCC and BRC) on the other side. I find and conclude that the totality of the evidence presented to the court indicates that BRC was never treated by either side as anything more than an accounting device, to keep track of the funds being advanced by BEHR under the contracts, prior to the breakdown of their relations.

The separate organization of BRC was not even contemplated in the original negotiations between the parties, and was added in the final negotiations at the suggestion of *Bedford* rather than BEHR. Bedford had some tax problems involving consolidated statements that would be facilitated by having BRC organized as a separate entity having a different tax year. BEHR did not require the formation of BRC. BEHR acquiesed in the change because the separate entity of course would facilitate

its desire to have separate accounting for the new research and development funds. All liabilities and obligations of BRC under the contracts, in any event, were guaranteed by BCC and the record indicates that both BEHR and the outside world dealt with "Bedford" as one unit in terms of all products and technology being developed by the company.

The lack of materiality of the BRC incorporation, as a separate entity, is reflected in BEHR's complete lack of interest in defining what assets of BCC would be transferred to BRC in order that the latter would be able to perform the developing and testing necessary under the contracts.[3] BRC obviously was only an empty shell without some transfer of assets. It was only after the deal started to go sour that BEHR raised questions about transfers between BCC and BRC in that regard. Moreover, representations by both BEHR and Bedford to the outside world, as to the new products being developed, rarely even mentioned BRC and often simply referred to "Bedford" or "the Company" generically.

A visit to Bedford's premises likewise would give no notice of any separate entity inasmuch as "nothing was moved" and the same engineers continued to work with the same hardware and software physically located in the same offices before and after the transaction with BEHR.[4] We will also see a little later, after considering the various subsidiary agreements relating to the contemplated subsequent joint venture and licensing purchasing agreements, that the real party in interest BEHR was looking to for performance of the various requirements of the research and development

contracts was in fact BCC, rather than BRC as a separate and isolated entity. For all these reasons the court will hereafter refer simply to "Bedford" as the other contracting party, unless the context indicates a specific reference to BCC or BRC would be meaningful.

The package of documents relating to each "new product" consisted of the following: (1) Research and Development Agreement, actually executed by the parties; (2) License Option Agreement, actually executed by the parties; (3) Joint Venture Agreement, proposed for execution later following the successful development of the new product at the election of Bedford; and (4) Technology Purchase Agreement, likewise proposed for execution later, upon exercise of an option by Bedford to buy back the "New Technology" from BEHR. The package of documents also included a stock purchase warrant agreement, a continuing guaranty agreement, and a subscription agreement for units in the general partner of BEHR which are not material for purposes of this first trial.

The key agreement for present purposes is the Research and Development Agreement. This document, in the case of each new product, has the same basic provisions. The Agreement begins with the following recitals:

A. The Partnership has been organized to conduct research and development in connection with technology (the "New Technology") for the product described in Schedule B to this Agreement (the "New Product").

---

**3.** Bedford simply transferred assets to BRC that it felt appropriate for the task. It first casually informed BEHR it would just "donate" the assets. When Bedford's accountants questioned this, the transaction was recorded on its books as a purchase and sale as of December 31, 1983. When BEHR's new manager learned of this in July of 1984 his only concern was that "it should not be a 1983 event." The transaction was later changed to a "lease" at BEHR's request, since under § 174 of the Internal Revenue Code ownership of tangible depreciable property could jeopardize the tax benefits of BEHR's limited-partner investors.

**4.** The plaintiff did introduce evidence that one of the hardware engineers placed a "BRC" label on one of the computer machines being used on the BEHR research project but this isolated instance does not take away from the general finding made above. The evidence clearly establishes that BRC's "business" was not distinguishable from BCC's. It needs to be understood that the "New Product" prototype machines and peripherals did not in any way *look* to the outside observer as *physically* different in any way from the existing "Meteor" devices.

B. If the Partnership's research and development is successful, the Partnership intends to commercially exploit the New Technology by providing for the manufacture and sale of New Product units either by itself, through a joint venture (the "Joint Venture"), or through the sale or license of the New Technology to others.

C. The Partnership has obtained from the Company (as hereinafter defined) a license (the "Development License") to use the Existing Technology (as hereinafter defined) for the purposes of developing the New Technology.

D. The Contractor is in the business of design and research and desires to undertake projects as directed by the Partnership pursuant to this Agreement.

Looking through form to substance, as indicated above, the court considers references in this document to BRC as the "contractor", and to BCC as the "company", as being an immaterial distinction in terms of the obligations of "Bedford" visa-vis BEHR. Keeping that in mind, and ignoring the unnecessary complexity the BRC–BCC division brought into the contract, the key contractual provision for present purposes appears in Article III, "Design and Research", of the Research and Development Agreement, as follows:

3.1 Commencing on the Closing Date, the Contractor shall commence work on and diligently proceed with the development of the New Technology according to the specifications set forth in Schedule B attached hereto and made a part hereof. Any material deviation from such specifications, which would be incompatible with the development of the New Product, shall be made only with the prior written consent of the Partnership.

\* \* \* \* \* \*

3.5 All models, productions, processes, prototypes, contrivances, test fixtures, structures, drawings, and the like made or prepared for the Partnership by or on behalf of the Contractor, whether or not related to the New Technology or New Product, shall be the property of the Partnership and shall be delivered to it upon its written request to the Contractor. Patents, models, productions, processes, prototypes, contrivances, test fixtures, structures, drawings and the like existing on and before the date of this Agreement will not be property of the Partnership and not be transferable to the Partnership pursuant to the preceding sentence. The Contractor shall keep detailed records of the work done by it sufficient to enable the Partnership to identify and differentiate developments under this Agreement from Existing Technology and from other research and development work of the Contractor independent of that contemplated under this Agreement. The Contractor will retain all rights of ownership to any real or depreciable property which is acquired by the Contractor for us in connection with the performance of its obligations under this Agreement, such acquisitions not being contemplated as part of the Research and Development Budget set forth on Schedule C.

3.6 The contractor may place pre-production prototypes or pilot units on the premises of third parties and receive compensation therefor for the account of the Partnership.

3.7 Nothing in this Agreement shall be construed as a warranty or representation by the Contractor that research and development activities in connection with the New Technology or New Product will lead to the actual development of the New Technology, or if actually developed, that it will result in a commercially marketable product. The Contractor does not guarantee that a New Product or any part thereof will actually be developed nor does the Contractor guarantee that, if developed, the New Technology or the New Product so developed will have any economic utility whatsoever.

An attached "glossary" to the Research and Development Agreement contains the following pertinent definitions:

*"Component"* means any distinct proprietary feature of the New Product

which is incorporated into equipment other than a New Product.

*"Development License"* means the royalty-free license to use the Existing Technology in connection with the development of the New Product as more fully described in Section 10.1 of the License-Option Agreement.

*"Existing Technology"* means the trade secrets, know-how, technology and other proprietary information owned by the Company as of the date of the License-Option Agreement which are useful in the development, making, use and sale of the New Product.

\* \* \* \* \* \*

*"Improvements"* means the advances, enhancements or improvements made by the Company or any of its Affiliates or licensees to the Existing Technology and owned by the Company.

\* \* \* \* \* \*

*"License-Option Agreement"* means the agreement between the Company and the Partnership, under which the Existing Technology is licensed on a non-exclusive basis to the Partnership by the Company, the Warrant is granted to the Partnership by the Company, an option is granted to the Company to enter into the Joint Venture Agreement with the Partnership, and an option for the purchase of the interest of the Partnership in and to the New Technology is granted to the Company by the Partnership.

*"New Technology"* means any and all inventions (including any and all patents or patent applications resulting therefrom), processes, trade secrets, copyrights, and know-how created by or at the direction of the Partnership, or any person or entity engaged by the Partnership, relating to the New Product, and all incidents, discovered, devised, researched, developed or produced as a result of any research and development efforts in connection with the New Product performed by the Partnership or by a person or entity engaged by the Partnership, other than By-Products.

\* \* \* \* \* \*

*"R & D Completion Date"* means the date of delivery to the Partnership by the Contractor of production drawings for a commercially acceptable production model of a New Product unit utilizing the New Technology. With respect to a New Product consisting of computer software, "R & D Completion Date" means the date of delivery to the Partnership by the Contractor of a program in source code form which will substantially perform the tasks set forth in the description of the New Product contained in Schedule B. The delivery to the Partnership by the Contractor of a certificate certifying the date of delivery of the aforementioned production drawings or program shall conclusively establish the R & D Completion Date.

*"Technology Purchase Agreement"* means the agreement which may be entered into between the Company and the Partnership and which provides for the purchase and sale of the New Technology.

\* \* \* \* \* \*

*"Utilization License"* means the non-exclusive license from the Company to the Partnership which allows the Partnership to make, manufacture, sell and otherwise use all of the Existing Technology and Improvements as provided in Section 10.2 of the License-Option Agreement.

Article XI of the Research and Development Agreement, entitled "Security Agreement", provides in pertinent part:

11.1 Without prejudice to Partnership's ownership rights therein, the Contractor hereby grants to the Partnership a security interest in and makes an assignment of all of the Contractor's right, title and interest to the New Technology. The Contractor further hereby grants to the Partnership a security interest in a non-exclusive right to use all of the Contractor's right, title and interest in the Existing Technology solely in connection

with the making, manufacturing, sale or other use of the New Products or Components and for no other purpose. These security interests shall secure the obligations of the Contractor under this Agreement.

Article XI also provides for the execution of requisite UCC financing statements by Bedford and provides further that BEHR "at its discretion" may file the same under the Uniform Commercial Code "identifying therein or describing the Existing Technology and the New Technology as collateral." The evidence establishes that BEHR deliberately decided not to file the UCC-1 financing statements under the Uniform Commercial Code for fear that such notice filing would "inhibit" borrowing by Bedford. BEHR was aware that Bedford had already granted a security interest in its existing technology to the Merchants National Bank and felt that if its additional claims to both the existing technology and the new technology were recorded under Article 9 of the UCC it would discourage creditors from extending credit to Bedford.

Other provisions of the Research and Development Agreement, and the other subsidiary agreements, provide that the obligations of confidentiality on the part of *both* BEHR and Bedford with regard to *both* the existing technology and the new technology would continue and would remain binding notwithstanding the termination of the Research and Development Agreement and the other agreements. In other words, if the product development was not successful, or if successful but Bedford elected not to go into the joint venture development with BEHR, both parties were restricted from disclosing to third parties either the old or new technology developed by Bedford.[5]

The continuing obligation on the part of BEHR, in the event of a complete failure of successful development of new products, was necessary because BEHR under the agreements had a continuing right, without limit, to a non-exclusive license to use Bedford's existing technology *notwithstanding* the failure to develop any successful new technology for marketing purposes.

By virtue of the conduct of the parties, and a particular proviso in paragraph 3.5 of the Research and Development Agreement to be discussed later, these provisions effectively mean that BEHR will be in a position to prevent Bedford from selling *any* of its computer components, comprising its Vision Network System, if BEHR's claim of ownership is upheld. This would be so even though it is a fact that the new products were not successfully developed by the time of the Chapter 11 filing, and even though the contractual documents on their face purport to preserve Bedford's rights to its existing technology.

The key problem is that neither party attempted to establish any "baseline" to define the existing technology as of the closing date on the research and development contracts on December 31, 1983. It would have been relatively simple at that date to have ordered a print-out of "hardcopy" source code and object code from various magnetic discs and other magnetic media which embodied Bedford's "technology" as it then existed with regard to its various computer software and hardware products.[6]

5. This is a literal reading of Paragraph 4.1 of the R & D Agreement. Paragraph 4.3 provides that the confidentiality obligation "set forth herein .... shall survive the expiration or termination of this Agreement." The reference to "Existing Technology" in paragraph 4.1 follows an ambiguous reference stating "in the case of this Partnership only." Since both the Development License and the Utilization License were *nonexclusive* licenses it is perhaps arguable that the foregoing should not prohibit Bedford from disclosing its old technology to other parties in perpetuity.

6. The "object code" is the engineer's instructions translated into a language that only the computer hardware can "read" to become a functioning machine. It is an essential part of the machine in that sense. The "source code" is the same original set of instructions, expressed in a language that the engineers can read and deal with. Customers are almost never given the source code when they purchase a computer product. As one Bedford engineer testified, the source code is the "lifeblood" of any computer company and is rarely disclosed.

A problem was also presented by the fact that the specifications for the "new products" contained in the contract documents were very general and vague. The engineers at Bedford simply improvised and developed their own concept as they went along of what the "specifications" should be for the new products as *they* understood them.[7] It was also established that the engineering staff made no serious efforts to keep track of the "new technology" developments as separated out from the "old technology". There was disinclination to keep detailed records and commentary by the personalities involved. Moreover, the *modus operendi* at Bedford was an "organic process" in which *all* engineers working on *all* products had complete access to each other's work, at their own terminals, and routinely applied new ideas and improvements across the board into all of Bedford's products. While this may have been a breach of Bedford's contractual obligations to BEHR, the simple fact is that it did occur.

BEHR not only made no effort to establish a "baseline" at the outset of the contract period in December of 1983, but even in July of 1984, when a new general manager took over the affairs of BEHR, and had clear notice of the lackadaisical practices of the Bedford engineering staff, no effort was made by BEHR to require that Bedford establish some type of baseline and thereafter keep close track of the new technology developments separated from the old technology.

One reason for this curious inaction upon the part of the "owner" of the new technology stems from the fact documented throughout the record that BEHR was not realistically looking to the marketing of the new technology by itself as a primary goal of the entire transaction. In its advices to its own investors, and in other communications, BEHR repeatedly indicated that its prime object was to obtain a "royalty stream" from the ultimate development of the new products by Bedford as a part of its Vision Network System, in the contemplated joint venture arrangement if the products were successful.

Another reason apparently was that the "ownership" language in the documents had its primary importance in qualifying for the favorable tax shelter treatment under § 174 of the Internal Revenue Code. While the debtors made much of this being some sort of "scheme" reflecting upon BEHR's position, the court finds nothing improper in that regard since the tax provision in question was enacted by Congress as an appropriate method to encourage investment in new technology and products. However, this tax background does have some relevance in explaining BEHR's failure to insist upon a contemporaneous identification and segregation of the new technology developments.

Also of importance as a factor in explaining BEHR's behavior with regard to the engineering practices at Bedford, is the proviso in paragraph 3.5 of the Research and Development Agreement that "all models, *productions, processes,* prototypes, contrivances, test fixtures, structures, drawings, *and the like*" made or prepared with BEHR funds by Bedford "whether or not related to the New Technology or New Product, shall be the property of the partnership and shall be delivered to it upon its written request to the Contractor." [*Emphasis supplied*] With this proviso in place which arguably included software and technology, there was actually a disincentive to BEHR insisting upon separation of old and new technology developments, since BEHR would end up with ownership of both old and new technology to the extent that Bedford used BEHR funds in developing enhancements of its own products.

The end result of all of the foregoing is that BEHR was unable to establish at trial any definite dividing line between the

---

**7.** The evidence developed at trial establishes that the engineers at Bedford were relatively carefree "free spirits" who liked working at Bedford because the company had a reputation for being more hospitable to "creative computer engineering" as opposed to a more mundance concern with the profitable development and marketing of actual products.

source code and object code embodiment of the old technology, as opposed to the similar embodiment of the new technology in this case. When presented with the famous "piles of blue paper" and "piles of pink paper" which contained all the relevant source code printouts available from Bedford, BEHR's own expert witness testified that he could not divide that documentation into the old and new technology. [*See Plaintiff's Exhibits 87 (blue) and 88 (pink) re documentation involved*] In fact the witness found the documentation essentially meaningless since it largely omitted the "commentary" that programmers normally include when they have fully-developed source code data.

It is true that the court in the pre-trial phases of this case directed the debtors to produce hard-copy printouts of the relevant data, but from the testimony of the various witnesses at trial it became quite obvious that there was really no effective way to do this—given the commingling of data referred to above. Moreover, the "commentary" that should be in the source code documentation—*but isn't*—apparently resides in the mind of the former director of engineering at Bedford who was terminated by new management shortly after the Chapter 11 filing. While that individual, Mr. Erf, was called as a witness by BEHR, even he could not give a definitive separation of the "piles of paper" into old technology and new technology for the simple reason that in actual practice the engineering staff of Bedford did not keep those technologies separate.

The truth of the matter is that the engineers at Bedford enhanced the existing product line of Bedford almost automatically as they worked on the development of the new BEHR products. Since both BEHR and Bedford contemplated that the most realistic marketing of the new products would be in conjunction with the existing Vision Network System maintained by Bedford, that course of action is understandable in the circumstances. Whether it amounted to a contractual breach is unnecessary to decide in the present trial.

While it might be possible to "unscramble these computerized eggs" it would be a time-consuming process and quite expensive for the debtors to attempt to do it. In some cases, apart perhaps from the memory of Mr. Erf, it would be totally impossible in any event. This reality leads to the rather bizarre contention by BEHR in its post-trial memorandum that its ownership of "property" includes the "ideas in the heads" of present and former employees of Bedford. The necessary further proceedings in this court, and further activity by the debtor which would be required to identify the actual new technology covered by BEHR's ownership claim is illustrated in the proposed judgment in this matter submitted by the plaintiff and attached as Appendix III to this opinion. The debtors in their turn characterize BEHR's position as in effect requiring specific performance of what is still an executory contract to *identify* items purportedly sold to and owned by BEHR.

As of the close of the trial on this matter it is an inescapable fact that the record is insufficient to establish "what it is" that the plaintiff BEHR "owns" with sufficient specificity to permit entry of judgment for either reclamation of specific items embodying technology claimed to be owned, or declaration of ownership rights in any meaningful way, except in terms of the generalized description of the "new products" included in the original contractual documents.

## NATURE OF THE TRANSACTION

The parties take diametrically opposed positions as to the essential nature of the contractual transaction involved. The debtors view this situation as merely a disguised security interest transaction which was unperfected and therefore unenforceable. BEHR, on the other hand, stands on the literal language of the Research and Development Agreement providing its "ownership" and insists that it acquired that ownership *ab initio* as each action toward the development of the new products was taken by Bedford.

Both parties have cited many case decisions to the court for their respective views but, unfortunately, no case decision cited has really grappled with the nature of a research and development contractual arrangement in a bankruptcy context involving a computer company. Another tough question to grapple with—to be discussed later—is the nature of "technology" itself in terms of the legal concept of property rights. This latter question involves an examination of the unique characteristics of "source codes" and "object codes" in the form of magnetic media which are required to turn an assorted group of hardware components into a functioning "machine" in the newly-emerging computer industry.

█ The court is not however without general guidance in resolving the difficult questions presented by this case. It is well-established that in proceedings to determine the rights of parties against a bankruptcy estate the bankruptcy court as a court of equity may "look through form to substance" in determining the true nature of the transaction in question. *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); *In re Lord's, Inc.*, 356 F.2d 456 (7th Cir.1966); *In re Transystems, Inc.*, 569 F.2d 1364 (5th Cir. 1978); *In re Nite Lite Inns*, 13 B.R. 900 (Bankr.S.D.Cal.1981); *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674 (Bankr.S.D.Cal. 1982).

In the First Circuit, the foregoing principle was applied in the case of *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981). In that case, the Court of Appeals denied Eastern Airlines' petition to recover airline ticket proceeds from the trustee of the debtor travel agency, in the absence of a showing of identifiable segregation of such proceeds, notwithstanding contractual language to the effect that such proceeds "shall be the property of the carrier and shall be held by the Agent [travel agency] in trust for the Carrier...."

The Court of Appeals in *Morales* gives little weight to the *form* of the contractual transaction involved:

To be sure, Resolution 820(a) recited, in general terms, that the agent was to hold whatever monies it collected in trust for the carrier until accounted for, and that these monies were the carrier's property until settlement occurred. However, talismanic language could not throw a protective mantle over these receipts in the absence of a genuine trust mechanism. Here the relationship remained in practical fact that of debtor-creditor. The contract nowhere required Morales to keep the proceeds of Eastern's ticket sale separate from any other funds, whether Morales' own funds or the proceeds of other airlines' ticket sales. Nor was any specific restriction placed upon Morales' use of the supposed trust funds. Morales was left free to use what it received for its own benefit rather than Eastern's, and to transform the receipts into assets with no apparent encumbrance, upon which potential creditors might rely. The use of the word "trust" and the designation of the airline as titleholder, in a contract which is not publicly filed, would not save potential creditors from relying on such assets as office equipment, accounts receivable, and a bank account solely in the name of the agency. In the absence of any provision requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting their use, the label "trust" could in these circumstances and for present purposes have no legal effect.

\* \* \* \* \* \*

[T]he present problem is to determine, in a bankruptcy setting where third-party interests are very much at stake, the legal consequences that flow from a prior contractual arrangement. If a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests.

\* \* \* \* \* \*

We need not conclusively rule that the relation here is, for all purposes, one of debtor/creditor, however, for our holding would be the same even were we to find that the relation was intended to be one of principal/agent or consignor/consignee. In either such relationship, a principal or consignor who allows property to appear that of the agent's or consignee's estate will in the event of the latter's bankruptcy be estopped from recovering that property from the trustee, *see* 3 Remington on Bankruptcy § 1212.02, at 52–53 (Henderson ed. 1957), and cases cited therein; *cf.* 4 Collier on Bankruptcy § 541.08(2), at 541–39 (15th ed.); 4A Collier on Bankruptcy § 70.18, at 202 (14th ed.), and Eastern's failure to require segregation or restricted use of its funds has clearly served to create such an appearance here. [667 F.2d at 1071–1073]

■ Applying the foregoing general principles to the present case, I conclude that BEHR's claim to "ab initio ownership" cannot be sustained merely upon the contractual recitation of "ownership" of technology, in the absence of a genuine *mechanism* to *require* segregation and identification of the highly esoteric property involved. I note in this regard that the court in *Morales* held comparable contractual language ineffectual "in the absence of a genuine trust mechanism." I believe the present case involves a clearly analogous situation.

In addition, the *conduct* of the parties as noted above was completely inconsistent with any true contemplation of ownership prior to the completion of the research and development phase of the contractual agreements. As late as January of 1985, in a Private Placement Memorandum prepared by Bateman in conjunction with BEHR and Bedford, in an effort to obtain additional investment in Bedford from selected institutional investors, there is no mention of the "ownership" of BEHR in the new products. The memorandum does mention BRC but only describes it briefly as a "wholly owned subsidiary" of BCC.

In April of 1985, when Bedford had used up all of the funding on two of the new product projects, thus completing the research and development phase pursuant to the agreements, BEHR did not demand delivery of what it purportedly "owned" but instead moved in conjunction with a local bank to force a change in Bedford's management. In August of 1985, when BEHR initiated an arbitration proceeding in California against Bedford, which precipitated the Chapter 11 filing, there again was no demand for delivery of "owned" property but simply a demand for money damages and adjustments pursuant to various alleged contractual breaches.

There is also the background fact, corroborated by the entire record, that the new products had their greatest value as components of Bedford's Vision Network System. It is apparent that both parties operated on the assumption that there was no real need to deal with "ownership" considerations until, and if, the unlikely event occurred whereby BEHR would have to go out and try to market these new products and their technology as components of *somebody else's* computer system. From the totality of the evidence, it appears that the assumption all along was that the new products, if successful, would proceed into the joint venture phase with Bedford developing and marketing such products.

The conclusion therefore follows that the essential nature and substance of the contractual agreements herein involved constituted a contract *for* the sale of the property in question, with delivery to be made at the completion of the research and development phase, but only in the event that Bedford did not elect to proceed further into the joint venture phase and "repurchase" the technology developed.

### NATURE OF THE PROPERTY

Courts and attorneys are used to drawing distinctions between "tangible" and "intangible" property for purposes of various legal rules and principles. They find themselves confronted with a quite perplexing task, however, when called upon to

characterize the "software" used in the computer industry. Since the industry itself is relatively new, the case decisions are sparse. Such decisions as there are, and the legal perplexities involved, are discussed in a number of recent articles. See, e.g., *Horovitz*, "Computer Software As A Good Under The Uniform Commercial Code: Taking a Byte Out of the Intangibility Myth", 65 Boston University Law Review 129–164 (1985); Note, "Computer Programs As Goods Under the U.C.C.", 75 Michigan Law Review 1149–1165 (1979); Drabkin, "The Financially Troubled Computer Company," Practicing Law Institute (1986); Rabinowitz & Lake, "Security Interest In Computer Programs: Perfection And Enforcement", 32 The Practical Lawyer 53–64 (January 1986).

The confusing characteristics of software for legal analysis is well-summarized in the *Horovitz* article cited above as follows:

> Software has several traits that make its classification within the UCC a complicated question. Software exhibits characteristics of a good, a service, and an intangible. Typical software transactions take place in widely varying forms. When analyzing the applicability of the UCC to software, it is useful to consider the character of the property (whether it is tangible or intangible), the character of the transaction (whether it is a good

or a service), the form of the transaction (whether it is a sale, a lease, or a license), and the compatability of software transactions with the goals and effects of the UCC. [65 B.U. Law Rev. at 149]

If the court in the present case were compelled to make a definitive characterization, I believe I would conclude that the software here involved should be characterized as tangible rather than intangible property. The evidence establishes in excruciating detail that the source code and object code embodiment of that "technology" cannot exist independent from the actual hardware components to which it gives operational life. The source code does not demonstrate some broad generalized technology of technical principles and ideas, existing apart from a particular tangible machine already in existence, but instead presupposes the *prior* existence of particular hardware to give the source code itself any meaning.[8] Moreover, the source code is embodied in tangible magnetic media of various types, and when translated into equally-tangible object code media, becomes just as much a part of the "computer machine" being developed as any of its other tangible facets. In a sense, it could be said that the engineers at Bedford could not work on "technology" in any abstract way at all, but necessarily had to effectuate tangible changes in tangible machines by their very activity.[9]

---

**8.** It is important to understand that both codes, even when printed out in "hard-copy" form from the magnetic media, are not recognizable as "language" in the ordinary sense. As the testimony in the record indicates, and inspection of Plaintiff's Exhibits 87 and 88 will confirm, the printout just produces "gibberish" of two types. The source code "gibberish" is understandable to engineers *if* sufficient commentary is provided. The object code "gibberish" is understandable to no one but the computer. Courts have trouble enough reading contractual and statutory language and the undersigned judge has had to take on faith the foregoing gibberish-analysis presented by the expert witnesses. As far as this court is concerned, one of the piles of gibberish looks pretty much like the other pile. Cf. *Bank of Marin v. England, Trustee in Bankruptcy*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966) ("[W]e do not read these ... words with the ease of a computer.").

**9.** The court is aware of the decision in this district in *United States v. Antenna Systems, Inc.*, 251 F.Supp. 1013 (D.N.H.1966), dealing with a question under UCC Article 9 of whether a security agreement that described the security collateral to include inventory, work in process, contract rights, furniture, fixtures, and equipment (but not "general intangibles") covered "blueprint and technical data produced when the company's engineering staff designed a product." The court noted that it was being compelled to classify between mutually exclusive categories "property which arguably fits into both categories but which fits neatly into neither category." The court then ruled that "for purposes of this case these blueprints, drawings, etc. in reality the visual reproductions on paper of engineering concepts, ideas and principles, are general intangibles within the meaning of that term as used in the Uniform Commercial Code." This decision does not ap-

Fortunately, it is unnecessary in the present case to make a definitive judgment as to the "tangible" or "intangible" nature of the property in question. As we will see next, the legal result will be the same no matter which category covers the property being fought over in this proceeding.

## OWNERSHIP CLAIM
## AGAINST ESTATE

■ To the extent that the property in question is deemed to be tangible property, it would fit within the definition of "goods" under Article 2—105 of the Uniform Commercial Code. That provision in relevant part provides as follows:

> "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action.

This would then bring into play the provisions of Article 2–402(1) of the Uniform Commercial Code, which provides (with exceptions not now material) that the "rights of unsecured creditors of the seller with respect to goods which have identified to a contract for sale are subject to the buyer's rights to recover the goods under this article...." Article 2–716(3) then reaffirms that the buyer has a right to replevin goods only if they are "identified to the contract."[10]

From the findings in this case set forth above, it is clear that property claimed by the plaintiff was never identified to the research and development contract, and related agreements, within the meaning of these provisions of the Uniform Commercial Code. As indicated earlier, printouts of source code at the inception of the contract, to establish a "baseline" definition of the existing technology, and source code printouts and segregation during the new developments activity, could easily have been required by BEHR if it were seriously interested in asserting its ownership rights from the beginning. The use of "source code escrows" has become common in sales and financing transactions involving the computer industry—according to the evidence presented to the court.[11]

BEHR having failed to require such segregation and identification, and the defendants as debtors-in-possession having the status and avoiding powers of a trustee under §§ 1107 and 544 of the Bankruptcy Code, the defendants accordingly can defeat the plaintiff's claim for reclamation of the property in question. The debtors do this as trustees standing in the shoes of their creditors to facilitate the reorganization of this estate under the bankruptcy laws.

■ Even if the property in question is viewed as being mixed in nature, i.e., involving both tangible "goods" and related intangibles of some sort, the sales provisions of Article 2 of the Uniform Commercial Code still apply where the "goods" aspect of the transaction *predominates* over the other aspects. See, e.g., *Bonebrake v. Cox, supra; Standard Structural*

---

pear to be a very strong precedent for a similar ruling involving property having the unique characteristics of computer software. See also, *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir.1974); *Standard Structural Steel Co., v. Debron Corporation*, 515 F.Supp. 803 (D.Conn.1980).

**10.** The pertinent provisions of the Uniform Commercial Code are in force in the same form in both California and New Hampshire. See *California Commercial Code* § 1101 et seq; *N.H. Revised Statutes Annotated* 382-A:1–101 et. seq.

**11.** Plaintiff argues that source code escrows are not all that practical and raise many vexing questions as indicated by the commentators. See Gilburne, "The Use of Source Code Escrows and Technical Design," Vol. 1 *The Computer Lawyer* No. 4, 3 (May 1984); Rosenblum, "Software Escrows: Legal Concerns," 29 Boston Bar Journal 22, 25 (November 1985). The problems raised, however, deal only with situations in which only a security interest in the source code is involved. Those problems disappear if an actual *transfer of ownership* of the source code is truly intended. If BEHR truly "owned" the new technology source code *ab initio*, and was entitled to a nonexclusive license to use the source code involving the old technology, there is no reason why it could not have simply demanded printouts *to be held by itself* subject to the contractual confidentiality requirements.

*Steel Co. v. Debron Corporation, supra.* In the present case I find that that predominance of the "goods" aspect does obtain in the transaction in question, and therefore the Article 2 provisions of the Uniform Commercial Code would again apply, with the same result adverse to the plaintiff's claim for reclamation.

 Finally, if the property in question were to be viewed as *entirely* intangible in nature, which I do not believe to be so, the plaintiff's claim for reclamation still would have to be denied under case law decisions in the bankruptcy context denying reclamation on grounds entirely apart from Article 2 of the Uniform Commercial Code. The sale of intangibles is not covered by any Article of the Uniform Commercial Code and therefore existing common law decisions, either directly applicable or by analogy, may govern this situation.

The "sale" of an intangible that is easily commingled with the other assets of a debtor is the functional equivalent of the purported "trust" of cash held subject to strict identification and segregation requirements in *In re Morales Travel Agency*, 667 F.2d 1069 (1st Cir.1981). The property involved in *Morales* was cash, and cash itself is an intangible. *DiFlorio v. United States*, 30 B.R. 815, 9 C.B.C.2d 560 (N.D.N.Y.1983). The Court of Appeals in *Morales* reached its decision without any reference to the Uniform Commercial Code. It relied instead upon case law decisions interpreting the bankruptcy-estate property definition in § 70(a) of the Bankruptcy Act of 1898, as amended *[11 U.S.C. A § 110(a)]*. The definition of property of the estate under that prior statutory provision is not materially different, for present purposes, from the definition now incorporated in § 541 of the 1978 Bankruptcy Code, as amended. *[11 U.S.C. A § 541]*.

There is a long line of decisions, many of them prior to the first enactment of the Uniform Commercial Code in 1953 in Pennsylvania, applying the foregoing concepts concerning the reclamation of property from a bankrupt estate. See 4A *Collier on Bankruptcy*, 14th Ed., §§ 70.25[2] and 70.-39[3] (1978). As the *Collier* treatise writer commented in that regard:

A petitioner in reclamation is required to identify positively the property he seeks to reclaim. Where the property sought has been mingled with other goods or property of the bankrupt, the claimant must trace his property according to the principles previously set forth in this treatise. If he fails, he cannot reclaim, no matter what the equities are, and he is relegated to the position of asserting his rights as a general creditor.

\* \* \* \* \* \*

Once the trust relationship has been established, one claiming as a *cestui que trust* thereunder must identify the trustee fund or property in the bankrupt estate, and, if such fund or property has been mingled with the general property of the bankrupt, sufficiently trace the trust property. In other words, to sustain a claim to trust property or to an equitable lien thereon, the claimant must depend upon his ability to identify the property in its original or substituted form in the hands of the bankruptcy trustee. The basic idea of the trust doctrine as applied in bankruptcy is a fair and reasonable identification of the property or fund so as not to harm other creditors. It is not enough, therefore, to show merely that the funds or property came into the bankrupt's hands or went into the bankrupt's business or, by the better view, even that the funds or property are contained somewhere within the bankrupt's estate. [Section 70.39[3] at p. 478] [Section 70.25[2] at pp. 354–356]

The case decisions are collected and discussed in detail in the foregoing treatise. Subsequent decisions under § 541 of the 1978 Bankruptcy Code are collected in 4 *Collier on Bankruptcy*, 15th Ed., § 541.13 (1986). A recent decision applying these principles to a demand for imposition of a *constructive* trust appears in *In re Richmond Children's Center, Inc.*, 49 B.R. 262 (S.D.N.Y.1985).

In my judgment, a "sale" of computer software of the nature here involved, left

in the possession of the "seller" without any separate identification or segregation, is in no material aspect different from a "trust" of any other type of intangible. Accordingly, the legal result when reclamation from a bankruptcy estate is demanded should be the same. I realize this decision is reached by analogy but it appears the analogy is apt and inescapable.

## CONCLUSION

The decision in this "first trial" must be for the defendants and against the plaintiff. As the foregoing discussion indicates, the issues are not simple but general principles are available to apply to the novel nature of the property involved, and to the complex research and development contractual arrangements between the parties. Considering those principles, it would behoove any financing party, whether a developmental buyer or a secured lender, to take easily available steps to identify and segregate the relevant source code embodiment of this new and elusive type of property interest, i.e., the "software" and "technology" of a company involved in the computer industry. Such identification and segregation, with appropriate warning to the world of the third-party's interest in such slippery and changeable property, should suffice to protect the third-party from the assertion of creditors' rights in any subsequent bankruptcy proceeding.[12]

In the present case the plaintiff simply did not take any appropriate actions to assert and define its claimed ownership rights in the property in question and therefore it is not inequitable to deny enforcement of those rights in a subsequent Chapter 11 bankruptcy reorganization proceeding in which some $1,800,000.00 of unsecured and unpaid credit was extended to the Bedford enterprise by various trade

creditors and suppliers as indicated on the debtors' schedules filed as of their filing on November 13, 1985.

The plaintiff contends that the decision for the defendants in this case would be inconsistent with this court's prior ruling in *In re North American Rental*, 54 B.R. 574 (Bankr.N.H.1985). In that case the court held that an equipment lessor could recover various items of heavy construction equipment leased to the reorganization debtor. The court first determined that the leases in question were "true leases" rather than disguised secured financing, and therefore were not covered by Article 9 of the Uniform Commercial Code. The court went further in *North American* and noted that the leases were still "bailments" subject to various common law standards, but that reclamation from creditors of the bailee was still appropriate in the absence of any misleading representations or conduct upon the part of the bailor.

The difference between *North American* and the present case is the difference between what was obviously and clearly tangible property in that case, coming under recognized principles of bailment law, as opposed to the complex type of property involved in the present case. The only similarity is that the lessor in North American, and BEHR in the present case, both were passive with regard to assuring any labeling or other segregation of the property involved. However, a bulldozer "commingled" with the other tangible equipment of a company still has obvious tangible physical form giving notice to the world that it exists. An interested creditor debating extending credit to the company involved can always ask for proof of ownership by bill of sale or certificate of title—as was noted in the *North American* opinion. [*54 B.R. at p. 578*] Here it would be ludicrous to expect any creditor to ask for

---

**12.** The record in the present case does indicate that reference was made to the new products being developed for BEHR in BCC's 10K Report to the SEC. [See Appendix II to this Opinion] However, this reference again was only in terms of the vague, generalized descriptions of the same discussed above. Moreover, even assuming a trade creditor should be expected to scan

10K Reports in the first place, the reference to "four contracts" and the entire thrust of the Report gives no notice that BEHR in effect could claim it "had bought Bedford's business." Cf. also *Uniform Commercial Code*, Article 6, § 6–102 et. seq.; and *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), as codified by § 544(b) of the Bankruptcy Code.

a bill of sale evidencing Bedford's ownership of its own technology.[13]

For all of the foregoing reasons, the court concludes that those portions of the plaintiff's complaint demanding reclamation of property, and a declaration of the plaintiff's ownership of the same, must be denied. This determination accordingly renders moot for present purposes the contingent request for rejection authorization contained in the debtors' counterclaim. The further issues relating to BEHR's status in these proceedings and the conflicting assertions of breach of contract and related matters are left for determination at the "second trial" to be conducted hereafter in this case. A separate final judgment shall be entered with regard to the issues herein determined by the findings of fact and conclusions of law set forth in this Memorandum Opinion.

---

**13.** The plaintiff's even contends in the present case that BEHR itself was a "bailor of cash" to Bedford. I find no substance to the plaintiff's bailment contention and no case has enforced that concept in a bankruptcy context. The pre-UCC, non-bankruptcy decision in *Hope Shoe Co. v. Advance Wood Heel Co.*, 89 N.H. 178, 195 A. 669 (1937), accordingly is inapposite.

APPENDIX I

# THE VISION NETWORK SYSTEM

The Vision Network System from Bedford Computer opens a new world of technology to the composition marketplace. Using state-of-the-art computerized workstations and peripheral equipment, Bedford links its workstations by a local area network, the highly efficient Ethernet, specially enhanced by Bedford.

A system is more than just a collection of terminals. It is the integration of all components—pagination terminals, input alternatives, storage devices, personal computers, laser proofers, line printers, typesetters, telecommunication ports and other peripherals—into a totally cohesive entity. The Vision Network System is expandable in all these functions plus many more. Each Meteor Workstation is based on its own independent processing power, the Motorola MC68000 microcomputer, and thus becomes an individual "node" on the network. The workstations are used as building blocks to create the optimum configuration for the particular use of a customer.

Since each station has its own microcomputer as its computation source, The Vision Network System has quick response time and throughput regardless of the activity on other workstations. This workstation integrity is far superior to shared-logic systems noted for performance degradation as particular users tax the central processing unit of those systems.

## COST CONSIDERATIONS

As important as performance is the cost factor in selecting a new pre-press system.

Bedford Computer has designed a family of meteor workstations, each with near-unlimited modularity, to offer "customized" configurations at extremely low cost. The family consists of the Meteor 3000 Pagination Station, the Meteor 2000 Galley Composition System, the Meteor 1000 Text Composer and the Meteor Star.

Galaxy configurations can range from single-terminal Meteor production centers to up to 254 stations on the Bedford-enhanced Ethernet.

## THE VISION NETWORK SYSTEM

APPENDIX II

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-K

Annual Report Pursuant to Section 13 or 15(d) of
the Securities Exchange Act of 1934

For fiscal year ended December 31, 1984

Commission File No. 2-72639

BEDFORD COMPUTER CORPORATION
(Exact name of registrant as specified in its charter)

| New Hampshire | 02-331953 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

| Tirrell Hill Road, Bedford, N.H. | 03102 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

(603) 668-3400
(Registrant's telephone number, including area code)

Securities Registered Pursuant to Section 12(b) of the Act:

NONE

Securities registered pursuant to Section 12(g) of the Act:

NONE

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes _X_ No___

The aggregate market value of the Registrant's Common Stock, No Par Value, held by nonaffiliates of the Registrant as of March 25, 1985 was $4,041,125.

As of February 28, 1985, there were 1,457,800 shares of the Registrant's Common Stock outstanding.

The total number of pages contained in this report is 51. The exhibit index begins on Page 48 of this report.

PART I

Item 1. *Business.*

General

Bedford Computer Corporation (the "Company") develops, manufactures and markets pre-press graphic composition systems utilizing microcomputer based terminal workstations (developed and manufactured by the Company) and proprietary applications software. The Company's Vision Network System™ allows its customers to compose and edit copy, including type, line art and graphic drawings, for output to proofing printers or phototypesetters and photo-imagesetters. This is accomplished in a real time mode whereby the craftsman composes copy while simultaneously viewing the work in progress on a display screen in the same format as it will appear in print, without confusing command codes appearing within the text. In this manner, the Company's systems automate and simplify most composition functions necessary to produce high quality typography. This enables the Company's customer to achieve substantial cost savings by increasing the productivity of composition craftsmen and by reducing the composition time and material involved in printing projects. The Company sells its systems primarily to financial and legal printers, newspaper, text-

book and magazine publishers, trade typographers and businesses with or in need of in-house composition facilities.

In addition to the foregoing, the Company, through its wholly-owned subsidiary, Bedford Research Corporation ("BRC"), has contracted to perform certain research and development services for BEHR Venture Partners, Ltd.—1983 (the "Partnership"). Revenues earned from such contracts for the year ended December 31, 1984 were approximately $2,699,000 or 21.7 percent of the Company's total consolidated revenues.

The Company was incorporated as N.E. Berg, Inc. under the laws of New Hampshire in 1975, but did not commence operations until 1977. The Company's present name, Bedford Computer Corporation, was adopted in 1981. The Company's principal executive offices are located at Tirrell Hill Road, Bedford, New Hampshire 03102, and its telephone number is .(603) 668–3400.

Products

The Vision Network System™ utilizes microcomputer based Meteor™ terminal workstations developed and assembled by the Company together with the Company's applications software operating under UNIX operating system software. (UNIX is a trademark of Bell Laboratories, a subsidiary of American Telephone and Telegraph Company). A Meteor™ terminal workstation consists of a microcomputer utilizing the 32-bit Motorola 68000 microprocessor chip, an electronic keyboard, computer-driven graphic display screen and floppy or hard disk systems for local storage. Individual Meteor™ pagination workstations are connected to other Meteor™ terminal workstations (or workstations provided by other vendors such as the IBM personal computer) as well as to system peripherals by means of the Company's Ethernet based local area network. (Ethernet is a trademark of Xerox Corporation.)

The year ended December 31, 1984 marked the first full year in which the Company marketed The Vision Network System™. Prior to 1984, the Company's principal product consisted of composition systems based on minicomputers supplied by Digital Equipment Corporation. During the year ended December 31, 1984, Bedford sold 48 Vision Network Systems™.

The Company's utilization of modular Meteor™ terminal workstations interconnected by means of its local area network provides great flexibility in system configuration. Depending upon the needs of the Company's customer, system configurations, from a single stand-alone workstation to well over 100 workstations together with various peripheral devices, are possible.

A typical Vision Network System™ consists of three or four Meteor™ terminal workstations, each with one floppy disk drive and one 36 megabyte hard disk drive, connected to each other by means of the Company's local area network, with interfaces to a proofing printer and typesetting system selected by the customer. Any configuration can be upgraded by the addition of Meteor™ terminal workstations or system peripherals as the customer's needs change. The price of a Vision Network System™ generally ranges from approximately $70,000 to approximately $400,000.

Manuscript materials may be input into The Vision Network System™ directly through the keyboard of a Meteor™ terminal workstation or indirectly through a variety of input devices, such as word processors, mainframe computers, mini and microcomputers and optical character recognition equipment, which can be located on-site or in a remote location. Input from such devices can be captured by means of a direct cable connection, a telecommunication link or through reading of that device's storage media (for example, floppy or hard disks and magnetic tapes). Once material has been input into the Company's system, conventional steps of copy preparation are minimized by utilizing computers to perform certain tedious and routine composition procedures such as line endings (hyphenation and justification) and kerning (character spacing). A user can view the composed material on the computer driven display screen in exactly the same form as

it will appear in print, without having to view confusing command codes intersperced with the composed material. If the user desires to edit the composed material, the changes can be entered through the electronic keyboard and concurrently viewed on the display screen. Once the user is satisfied with the appearance of the composed material, it can be output to either a page proof generating printer, an intelligent copier, a phototypesetter or the Company's 5250 electroerosion printer.

Markets and Customers

The Company traditionally has sold its systems primarily to customers in the commercial printing industry. Recently, however, many businesses such as large financial and industrial companies, service organizations, publishers and printers which have historically contracted with commercial typographers for composition services have begun to develop the capability to perform such service in-house. The Company recognizes that this developing in-house market is of growing importance.

The Company markets its systems and services domestically and in Canada, in German speaking countries and in Scandinavia through a direct sales force of 15 salespersons located in 12 cities. The sales force is supported by a marketing staff and by the Company's customer service organization in Londonderry, New Hampshire.

Foreign sales are made through six independent foreign distributors and representatives under agreements covering Japan, Israel, France, Switzerland, Luxemburg, Italy, England and Ireland, as well as through the Company's foreign subsidiaries, Bedford Computer GmbH and Bedford Skandanavien AB, in Germany and Sweden, respectively. The Company's revenues included foreign sales of $3,593,000, $2,833,000 and $3,824,000 for the fiscal years ended December 31, 1984, 1983, and 1982, respectively. Such sales represented 37 percent, 57 percent, and 52 percent of the Company's net sales for 1984, 1983, and 1982, respectively. The Company has incurred substantial losses in operating its foreign subsidiaries. In this respect, the Company is currently evaluating whether to continue maintaining such subsidiaries; to replace the direct sales forces maintained thereby with independent distributors; and other alternatives designed to reduce such losses.

The Company's domestic and foreign sales programs include direct sales solicitation, customer referrals, participation in trade shows and selected Company and product advertising in trade journals.

Price and system size are important marketing factors. Prior to fiscal 1984, the Company sold systems based on minicomputers supplied by Digital Equipment Corporation. The Company's minicomputer based systems, though believed by the Company to have had greater capabilities than systems sold by competitors, were generally more expensive. Fiscal 1984 was the first full year of the Company's new product line based on the Meteor™ microcomputer workstation. The Company believes that its existing product line based on its Meteor™ workstations is offered in the middle of the range of prices for comparable products, and the modular design of such systems allows the Company to address various configurations required by its customers.

In most cases, the Company sells its equipment outright. It does, however, give its customers the option of third party leasing. No significant portion of the Company's revenues is derived from leases held by the Company. The sales contracts under which the Company sells its products have varying terms and conditions depending upon the system configuration purchased and the customer's requirements.

Service, Support and Customer Training

The Company's systems are sold with a one year warranty for software and a 90 day warranty for hardware. In order to minimize service calls and customer system down-time, at the time that systems are installed the Company provides its customers with on-site training on the use and maintenance of its systems. In addition, customers may purchase a complement of spare component assemblies to replace any failing component assemblies until they can

be repaired. The Company also offers its customers a maintenance contract, the price of which depends upon the system configuration installed. The contract provides the customer with preventive maintenance, on-call service and replacement parts.

The Company's customer service organization, consisting of four field service engineers, six applications personnel and four administrative personnel, performs system installations, preventive maintenance and on-call service for the Company's domestic customers. Software support services are also provided to domestic customers by the Company's customer service organization.

The Company's customers in foreign countries receive service, support and training from the Company's independent distributors serving those foreign countries or from the Company's foreign subsidiaries, which are in turn assisted when necessary by the Company's customer service organization.

The Company believes that its ability to provide prompt and efficient service, support and training to customers is essential to maintaining good customer relations and Company growth.

Suppliers

The Company purchases hardware components used in the manufacture of its composition systems from a small number of suppliers. While its relationship with its suppliers is satisfactory, the Company believes that alternative and comparable sources of supply could be developed if required.

In early 1984 the Company entered into an agreement with International Business Machines Corp. ("IBM"), pursuant to which the Company can acquire IBM 4250 electroerosion printers from IBM at a volume discount price for resale to the Company's customers (as part of one of its systems) under the Company's own label. The IBM 4250 electroerosion printer is an output device, which the Company markets as either a high quality proofing printer or a medium resolution substitute phototypesetter.

The Company believes that its relationship with IBM is good. It would be more difficult to develop alternative and comparable sources of supply for the electroerosion printer than for the products supplied by the Company's other suppliers.

Competition

The Company operates in the highly competitive electronic publishing industry which is subject to rapid technological changes resulting in the frequent introduction of new products and services. In the Company's opinion, price, system capability, dependability, productivity, and the ability to upgrade are all significant competitive factors.

Many of the Company's competitors are substantially larger and have far greater financial, marketing and personnel resources than the Company. There is no assurance that systems similar to or more advanced than those developed by the Company will not be developed by the Company's competitors or that the Company will not be adversely affected thereby.

Research Services

In addition to marketing its computer systems, the Company, through BRC, performs research and development services under four contracts with the Partnership. Each of the contracts provides that, for a specified fee, BRC will diligently proceed with a research and development project designed to develop (on a best efforts basis) a specified product. The four products being developed for the Partnership were originally expected to become components for the Company's Vision Network System™. The products include a word processing terminal, a graphics workstation, a digital scanner (input device) and an image generator (output device).

All technology resulting from the services performed under the research and development contracts, including the new products (if the projects are successful), becomes the property of the Partnership. The Company does have the right, how-

ever, to obtain rights to one or more of the new products and related technology by entering into a joint venture with the Partnership to commercially exploit such product(s) and, after a minimum joint venture period, purchasing the products and related technology.

Upon successful completion of each project, the Company has a 30 day option period in which it may elect to form a joint venture with the Partnership for purposes of commercially exploiting the new product. If it elects to joint venture with the Partnership, the Company is obligated, if required by the joint venture, to make working capital loans to the joint venture in varying amounts for each new product ($2.4 million in the aggregate for all the projects). If the Company elects not to joint venture with the Partnership, the Partnership is free to exploit the new product and related technology as it sees fit.

During the first 14 months of the joint venture period, profits of the joint venture, if any, are to be divided 80 percent to the Company and 20 percent to the Partnership. Thereafter, profits are to be divided 60 percent to the Company and 40 percent to the Partnership. Either party can elect to terminate the joint venture at the end of 15 months, in which case, unless the product and related technology is purchased by the Company pursuant to a Technology Purchase Agreement, the Company will have no rights thereto.

The Company may elect to purchase one or more of the new products and related technology from the Partnership at any time up to 13 months after commencement of the joint venture with respect to such product. Such purchase shall become effective 14 months after such date of commencement. If the Company so elects, the Company will be obligated to pay the Partnership a down payment and a continuing royalty equal to a specified percentage of the Company's sales price for new products sold. Down payments for all the four products aggregate approximately $132,-000. If the Company elects to purchase any product, the Company will be obligated

to pay a royalty of 10 percent of its cumulative gross revenues derived from all such product(s) until such revenues total approximately $155 million. Thereafter, the specified percentage payable to the Partnership decreases until 2 percent of such sales are payable after the Company has reached cumulative gross revenues from the sale of all such product(s) of approximately $350 million. All royalty payments cease ten years from the date the new product(s) and technology are purchased.

It is currently projected that the research and development phase with respect to the digital scanner, word processing terminal, graphics workstation and image generator will be completed in June, 1985, June, 1985, December, 1985 and the first quarter of 1986, respectively. The Company will decide whether or not to enter into the joint venture phase with respect to each of the products as the research and development with respect thereto draws nearer to completion. In deciding whether or not to joint venture a given product, the Company will consider various factors, including, the value of the technology represented thereby, the requisite amount of capital investment associated with commercially exploiting that technology and the Company's ability to obtain such capital.

New Product Development

The Company's ability to compete successfully in an industry that is subject to rapid technological change requires on-going emphasis on new product development. During fiscal 1983, 1982 and 1981, the Company's research and development expenditures were $861,000, $385,000 and $583,000, respectively. Expenditures for Company-sponsored research and development in fiscal 1984 decreased to approximately $238,000 as a result of the Company devoting a significant portion of its research and development efforts to services provided to the Partnership.

Trade Secrets and Security

Proprietary computer software constitutes a very important part of the Company's composition systems. In addition, certain designs of the Company's hardware

are proprietary. Both customers and employees are required to execute agreements not to copy the Company's software or to disclose its proprietary information. Covenants restricting employees from working for the Company's competitors for a period of time following termination of employment are also included in the Company's employment contracts. In addition, source code is never supplied outright to customers, although from time to time the Company has deposited source code into escrow in order to reassure customers that the source code will be available in the event that the Company does not support its software.

Employees

As of December 31, 1984, the Company employed 94 full-time employees of whom 43 were engaged in production, 25 in product development, 15 in marketing and sales and 11 in executive, administrative and clerical capacities. The Company also had four part-time personnel in various capacities.

Competition for experienced programmers, electrical engineers and technical personnel required by the Company's business is intense. None of the Company's employees are represented by a union. The Company believes that its employee relations are good.

Item 2. *Properties.*

The mailing address of the Company's headquarters and engineering facility is Tirrell Hill Road, Bedford, New Hampshire. Such facility is actually located in the adjoining Town of Goffstown, New Hampshire and is leased from N. Edward Berg, the Company's President and principal shareholder, pursuant to a lease which will expire in 1991. Annual payments to Mr. Berg under the lease are $96,000. In addition, the Company is responsible for maintaining and insuring the facility and for paying all property taxes.

## APPENDIX III
### [PROPOSED] ORDER

1. BEHR Partners are hereby declared to be the owners of all the property described in paragraphs 2 and 3 herein.

2. Pursuant to 11 U.S.C. § 725, Bedford Computer Corporation and/or Bedford Research Corporation are ordered to turn over to BEHR Partners the following:

a. all equipment, hardware and software described in the January 28, 1986 list produced by Defendants, Plaintiff's Ex. 37(b);

b. the source code and additional documentation contained in Plaintiff's Ex. 87 and 88.

3. This Court finds that the listings of technology contained in Plaintiff's Ex. 37(b), 87 and 88 do not constitute a full description of the property owned by BEHR Partners, and that Defendants have failed or refused to produce more complete documentation, despite Court orders and contractual requirements. Therefore, the Court will describe in English the following functional description of property to be turned over to BEHR Partners, which in some instances may duplicate that ordered by paragraph 2 herein:

a. digital scanner—prototype modified Data Copy camera and table
—two circuit boards with histogram capability
—software for user interface
—*not included is the interface to Autokon scanner*

b. image generator—prototype daylight version marking engine (2,700 dots/inch)
—circuit board interface in that marking engine
—circuit board interface inside Meteor
—device driver software
—raster image processor (circuit boards and software including software under development)
—circuit board and software interface to Autokon 720, Autokon 1000, ECRM Pelbox, IBM 4250
—modified software for Pacific Micro CPU

c. graphics workstation—software for manipulation and integration of graphics, including PIX and EDSIS graphics portion
—prototype Sun workstation

—prototype display controller interface board

—BIGS software primitives

—Window software primitives

d. word processing workstation—software and circuit board interface of IBM PC to Meteor, including interface to Bedford keyboard and monitor, Bedford network

—software translation of IBM compatibile programs to Bedford format

e. complete documentation, blueprints and user manuals for the above components are likewise required to be turned over.

4. This Court finds that Defendants' documentation standards as such were poor, and the assistance of present or past employees of Defendants may be necessary to implement this order. Therefore, BEHR Partners is permitted, at its expense, to enlist present or past employees of Defendants to define the scope of this order, and assist in the turnover of the property described in paragraphs 2 and 3, without said individuals violating any noncompetition or secrecy agreements with Defendants. Said individuals shall report directly to the Court within 60 days. Defendants shall be entitled to review the definitions made by these employees, and any disputes not resolved by the parties shall be the subject of a further hearing of this Court, upon motion. In guiding this definitional process, the Court finds that as of December, 1983, Bedford's capabilities were limited to text composition using various sizes of stick figures on the screen, with no ability to integrate graphics or to interface to a digital scanner or image generator.

5. Bedford Computer Corporation is enjoined from selling any products using technology owned by BEHR Partners, and is liable for royalties on any sales made to date, the amount of which will be calculated at the second trial.

6. To effectuate this order, the parties continue to be governed by a mutual obligation of secrecy toward the technology of the other.

ORDERED this __ day of April, 1986 at Manchester, New Hampshire.