**In re C TEK SOFTWARE, INC., Debtor.**

**C TEK SOFTWARE, INC., Plaintiff,**

v.

**NEW YORK STATE BUSINESS VENTURE PARTNERSHIP, Jeanne Mauney a/k/a Jeanne Mauney Chambers, and Intelligent Investment Systems, Inc., Defendants.**

**Bankruptcy No. 89–303.**
**Adv. No. 89–161.**

United States Bankruptcy Court,
D. New Hampshire.

July 31, 1990.

Jerome Meyers, White River Jct., Vt., for defendant Jeanne Mauney Chambers.

Mark W. Vaughn, Devine Millimet, P.A., Manchester, N.H., for defendant N.Y. State Business Venture Partnership.

Douglas G. Thornton, R. Peter Decato, R. Peter Decato Law Office, Lebanon, N.H., for plaintiff C Tek Software, Inc.

Kenneth R. Bruce, Buchanan Ingersoll P.C., Pittsburgh, Pa., for defendant Intelligent Investment Systems.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

Debtor, C Tek Software, Inc., initiated an adversary proceeding against certain creditors to determine the validity, extent, or priority of certain liens. This court has jurisdiction under 28 U.S.C. § 157(b)(2)(K), and the general reference order dated February 11, 1985 by the U.S. District Court for New Hampshire. A trial was held on February 12 and March 7, 1990, oral arguments were heard on March 28, 1990, and I then took the matter under submission.

Basically, C Tek is attacking New York State Business Venture Partnership's ("NYSBVP") security interest under its power as a trustee under section 544(a), where as a lien creditor C Tek takes priority over unperfected security interests. In addition, Intelligent Investment Systems, Inc. ("IIS") is claiming it has priority over NYSBVP's lien because NYSBVP failed to reperfect its lien. The reason C Tek and IIS claim NYSBVP's lien is unperfected is that NYSBVP failed to reperfect four months after certain collateral was moved out of New York and C Tek moved out of New York as required by UCC § 9–103.

### Facts

The debtor corporation was formed in 1976. It started developing its only currently saleable product—a software for banks called "ClienTrak"—in 1982. Since that time, the software has been continually improved through modifications.[1]

In early 1987, Rothschild, Inc., which is the managing partner of NYSBVP, an entity that invests money for a pension fund, developed an ambitious plan for NYSBVP and others to invest substantial sums of money in the debtor. However, due to the stock market crash and perhaps for other reasons, only $320,000 was loaned to the debtor by NYSBVP. The Restated and Amended Revolving Credit and Security Agreement of October 26, 1987 took a security interest in some pieces of hardware and "[t]he source code and all ownership rights to the computer software ClienTrak including copyrights 1983, 1984, 1985, 1986 and 1987." The security interest was properly perfected in New York, which is where the debtor and all of its assets were located at that time. Also in 1987, Jeanne Mauney Chambers, the wife of the principal of the debtor corporation, loaned the corporation $82,000. This loan was expressly subordinated to the first lien of NYSBVP. However, apparently no security agreement was ever executed.

The note given to NYSBVP matured on January 31, 1988, and the debtor defaulted. The debtor has never paid NYSBVP anything. The debtor was in serious financial trouble in the spring of 1988. Consequently, Scott Jones of Rothschild, Inc. tried to find a potential investor or buyer for the debtor. In May, Jones gave Robert Chambers, the principal of the debtor, the name

---

1. This opinion does not determine the extent of the security interest NYSBVP has in the source code in light of the enhancements made after the security interest was taken. This issue is left for a subsequent trial.

of a company in Pittsburgh called Intelligent Technology Group who had some discussion with Jones about purchasing the NYSBVP note. The debtor then entered into a Master Distribution Agreement on June 17, 1988 with a company affiliated with Intelligent Technology Group called IIS. Jones was not informed of this agreement when it was executed. (The debtor claims it considered an alternative offer from a North Carolina company before making the deal with IIS.) The Master Distribution Agreement is a ten year licensing agreement which gives IIS the exclusive worldwide right to sell and develop the software ClienTrak. C Tek was supposed to receive royalties under the agreement according to a formula based on sales volume. The Agreement provided IIS could terminate it on 30 days notice for any reason. IIS acknowledges that it knew of NYSBVP's security interest when it entered into the agreement. IIS took a security interest in the software pursuant to the agreement.

On June 20, 1988, C Tek officially closed its offices in New York. A "considerable number" of C Tek's eighteen employees went to work for IIS, *including Robert Chambers, who worked full-time as the director of new business development for IIS from June 20, 1988 until May of 1989.*

Most of the books and records Chambers kept with him, and he moved to Hanover, New Hampshire in mid-July 1988. Some of the books he left with his comptroller who resided in New York, and some went to IIS in Pittsburgh. Most of the hardware went to IIS in Pittsburgh, but some went to IIS in New York. Chambers gave IIS the source code for ClienTrak. It appears that the source code was moved to IIS offices in Pittsburgh, but there may also have been a copy left at IIS offices in New York because a principal of IIS, Barry Oliver, at one point said "a copy" was moved to Pittsburgh and the bankruptcy schedules of C Tek listed the source code as being in IIS's New York office. IIS never informed NYSBVP that it was moving any source code to Pittsburgh.

There is a dispute about how NYSBVP found out about the Master Distribution Agreement. Chambers claims he verbally told NYSBVP a few days after the execution of the agreement. Jones, on the other hand, claims he first found out when he tried to call C Tek in New York in late June and was referred to IIS's number in New York who informed him that that company now handled C Tek business.

In any event, Chambers moved to Hanover, New Hampshire in mid-July for personal reasons—the location of a residence. On about June 20th, however, before he moved, he opened a post office box in New York for 3 months to accept any C Tek mail. On July 19, 1988 he sent his first formal written notice to NYSBVP of his plans for C Tek. That letter states:

C Tek Software, Inc.

30 Rockerfeller Plaza

New York, New York 10112

July 19, 1988

Mr. Scott T. Jones

Rothschild Ventures, Inc.

One Rockerfeller Plaza

New York, New York 10020

Dear Mr. Jones

I want to take this opportunity to bring you up-to-date on recent developments which may impact you as a creditor of C Tek Software, Inc. and, in particular, the timing of repayment of your balance. As you have probably been aware, C Tek has operated under financial hardship for the last two years. The Company's debts currently exceed $3.1 million and it has a negative net worth exceeding $2.0 million.

In the first half of 1988, the Company has been unable to meet all of its current obligations. Many operating expenses such as rent, equipment maintenance, phone bills and lease payments went unpaid and C Tek has been evicted from its offices. Only payroll and a few other essential expenses were paid over the last several months. In June, C Tek was unable to meet the general employee payroll. The Company's three executives are among the largest creditors;

they have received minimal or no compensation over the past two years.

For the last several months, management has pursued all possible options to continue operations and provide a means to pay or otherwise settle its obligations to creditors. Management attempted to conclude a venture capital financing that was initiated in 1987, sought corporate investments, and sought to be merged into or acquired by others. None of these financing alternatives came to fruition, however.

As a result of these events, on June 17, 1988 C Tek entered into a Master Distribution Agreement with Intelligent Investment Systems, Inc. (II), a wholly owned subsidiary of Intelligent Technology Group of Pittsburgh. IIS distributes application software to investment management firms and the parent is well known in the financial community.

The agreement authorizes IIS to be the exclusive worldwide distributor of C Tek's ClienTrak software and to maintain and support the software. Most of C Tek's employees have been hired by IIS to serve C Tek's customers and solicit future sales. As a result, C Tek has ceased day-to-day operations. The Company's expenses have been almost entirely eliminated since its "operational" obligations to customers have been assumed by IIS.

As part of the agreement, IIS will pay royalties to C Tek based on a percentage of ClienTrak sales. Essentially all royalties received can be utilized to retire debt, since there will no material ongoing expenses. It is anticipated that the debt will be serviced in the order of the secured positions held by the creditors. We are attempting to avoid a Chapter 11 proceeding and the associated legal expenses in order to provide the highest possible return for creditors. Our ability to amortize your balance will be based on the timing and extent of receiving sales royalties, of which no amount is guaranteed at this time.

We believe that C Tek's royalties from its new distribution agreement will create the highest probability of generating at least partial repayments of balances due. We are working on a plan for the fairest distribution of royalties.

Additionally, we are interested in determining whether a sale of assets would bring in additional cash for creditors and whether secured creditors would be willing to accept some up-front or shorter term cash payout in exchange for a substantial reduction in the balance owed. In return, they would have to eliminate any liens on our assets to permit the sale.

Please submit a statement of our current balance due you, and an expression of your interest in taking a percentage cash settlement of the balance. We would like to receive this information by August 5, 1988 in order to proceed as quickly as possible. Send all mail to C Tek Software, Inc., P.O. Box 5141, New York, NY 10185–0042. I can be reached by phone during business hours at (603) 643–8342. Thank you for your cooperation as we work to resolve these issues.

Very truly yours,

Robert L. Chambers

President

This letter gave no indication that Chambers was moving C Tek to New Hampshire other than perhaps the telephone number, which has a New Hampshire area code. Nor does the letter indicate C Tek is operating. In fact it is important to note that the letter says "C Tek has ceased day-to-day operations." Chambers had no employees in New Hampshire, and paid himself nothing. He opened a checking account, but only used it to pay an attorney, presumably for bankruptcy work. He was supposed to receive royalties, but never did because IIS claimed the first $19,000 in royalties to cover moving expenses IIS paid when C Tek had to leave its New York location. However, Chambers did receive two royalty statements for the period from June 1988 to March 1989. Yet, the statements total less than $19,000. Chambers aptly conceded his lack of business reasons for being in New Hampshire as follows:

Q. In July of 1988 was there any business reason for you to move to New

Hampshire and move C Tek to New Hampshire?

A. Our records were located there and there wasn't an operation of C Tek except for the receipt of royalties and the potential distribution of those royalties and so as the CEO, C Tek resided where I resided and for personal reasons, because I couldn't afford to live in New York, I had to move to New Hampshire. It's the only place I had an alternative place to go.

At another point in Chambers' testimony he described the extent of his activity in New Hampshire:

Q. How would you describe the activity that you did in New Hampshire with relationship to the C Tek business?

A. I received mail. I answered from creditors. I wrote letters to creditors and I received statements from Intelligent Investment Systems in regard to the software royalties that would be paid in. I contacted attorneys, so what business there was to be conducted by C Tek was conducted from my home in 202 Brook Hollow in Hanover.

Shortly after the July 19, 1988 letter was sent, Barry Oliver of IIS claims to have received a telephone call from Scott Jones in which Jones said NYSBVP might foreclose if some type of deal could not be worked out. Jones does not recall the call.

Chambers claims that he told Jones that he and C Tek were in New Hampshire. Jones acknowledges that he had at least one discussion with Chambers when Chambers was in New Hampshire, but Jones did not realize C Tek was claiming to do business in New Hampshire until C Tek sent a letter to Jones dated December 12, 1988 using a C Tek business address as a P.O. Box in Hanover, New Hampshire. The phone conversation that Jones can recall he had was on October 6th in which Chambers only talked about the success of IIS. However, there exists the following letter sent to Chambers by NYSBVP's attorney on August 10th:

Skadden, Arps,
Slate, Meagher, & Flom
919 Third Avenue
New York, New York 10022
(302) 735-3000
August 10, 1988

C Tek Software, Inc.
c/o Robert Chambers, President
202 Brook Hollow
Hanover, New Hampshire 03755

Re: Secured Promissory Note, dated April 30, 1987 (the "Note"), made by C Tek Software, Inc. in the principal amount of $320,000, payable to the order of New York State Business Venture Partnership *("NYSBVP") and due January 31, 1988.*

Dear Robert:

Thank you for sending over the Master Distribution Agreement. Please also send to me the exhibits, schedules (and any other attachments) to the Agreement; the copies you sent several weeks ago never arrived.

The principal amount owing C Tek's Note to NYSBVP is $320,000; the interest now payable is $35,027.39. All such amounts are now past due and payable at the office of NYSBVP at One Rockerfeller Plaza, New York, New York 10020.

Nothing contained herein shall be deemed to be a waiver of any rights, powers or remedies of NYSBVP may have under the Note or otherwise, all of which rights, powers and remedies NYSBVP hereby expressly reserves.

Very truly yours,
Kenneth J. Langan

cc: Intelligent Technology Group

Jones claims the August 10th letter was sent to other locations in New York because they didn't know where C Tek was. But Chambers claims NYSBVP knew where he and C Tek were. The language in the first paragraph of this letter to the effect that Chambers sent the attorney other information recently suggests NYSBVP did in fact know where Chambers and C Tek were located, but does not establish they knew business was allegedly being conducted in New Hampshire, for Uniform

Commercial Code purposes, as I will discuss further below.

After Jones received the December 12, 1988 letter NYSBVP had a meeting with Chambers where they asked for him to turn over the source code. Chambers refused.

Chambers estimates C Tek would have received $2 million in royalties over the 10 year life of the agreement. Barry Oliver says IIS has spent $3.4 million dollars in marketing, customer support, installation, bookkeeping, and enhancement of the source code. (This figure is based on costs and overhead allocation, not equity.) Oliver says the revenue for the ClienTrak software for 1989 was $750,000, which is about three times what it was for 1988. IIS is now solely devoted to the ClienTrak software business.

On April 6, 1989, C Tek filed a chapter 11 petition in this Court. On August 31, 1989, NYSBVP got a default order vacating the automatic stay but without prejudice to C Tek's rights to initiate this adversary proceeding.

*The Legal Issues: An Overview*

The attack on the NYSBVP lien is that it was unperfected as of the date of the bankruptcy filing because NYSBVP did not reperfect within four months after "ordinary goods" were moved out of New York to Pennsylvania, and/or that NYSBVP did not reperfect within four months after the debtor changed location to New Hampshire, if any of the collateral should be considered "general intangibles" or "mobile goods". See 13 Pa. Cons. Stat. Ann § 9103(a)(4)(i) (Purdon 1989); NHRSA 382-A:9-103(3)(e) (Supp.1989). Since these two statutory provisions are critical to this decision they are quoted in full as follows:

*Pa.Cons.Stat.Ann. § 9103(a)(4)(i)*

(4) When collateral is brought into and kept in this Commonwealth while subject to a security interest perfected under the law of the jurisdiction from which the collateral was removed, the security interest remains perfected, but if action is required by Chapter 93 (relating to rights of third parties; perfected and unperfect-

ed security interest; rules of priority) to perfect the security interest:

(i) if the action is not taken before the expiration of the period of perfection in the other jurisdiction or the end of four months after the collateral is brought into this Commonwealth, whichever period first expires, the security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a purchaser after removal;

\*  \*  \*  \*  \*  \*

*NHRSA 382-A:9-103(3)(e)*

(e) A security interest perfected under the law of the jurisdiction of the location of the debtor is perfected until the expiration of four months after a change of the debtor's location to another jurisdiction, or until perfection would have ceased by the law of the first jurisdiction, whichever period expires first. Unless perfected in the new jurisdiction before the end of that period, it becomes unperfected thereafter and is deemed to have been unperfected as against a person who became a purchaser after the change.

Therefore, I must first categorize the collateral subject to NYSBVP's security interest. Then, I can apply the items to these two provisions.

*Classification of Collateral*

There is no question the hardware moved to Pennsylvania are "ordinary goods." See *Neilson Business Equip. Center, Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del. 1987). There is also no question that the copyrights are "general intangibles", see NHRSA 382-A:9-106, as the comments to that UCC provision specifically refer to copyrights as intangibles, and all parties agree on that point.

█ The difficult question I am presented with is classifying the source code and its attendant ownership rights. The parties have presented three alternatives: ordinary goods, general intangibles and mobile goods. In the absence of any controlling authority in this Circuit, I will follow

my inclination as indicated in the dicta in *In re Bedford Computer Corp.*, 62 B.R. 555, 567 (Bankr.D.N.H.1986) to the effect that the source code is more tangible than intangible because "the source code ... cannot exist independent from the actual hardware components to which it gives operational life." *Id.* Cf. *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir.1985) (software is a good not a service).

I realize this question has split state courts trying to decide if software is tangible or intangible for state tax purposes. Compare *Pennsylvania and West Virginia Supply Corp. v. Rose*, 368 S.E.2d 101 (W.Va.1988) (tangible); *Measurex Systems, Inc. v. State Tax Assessor*, 490 A.2d 1192 (Me.1985); *Hasbro Indus., Inc. v. Norberg*, 487 A.2d 124 (R.I.1985); *Citizens and Southern Systems, Inc. v. South Carolina Tax Comm'n*, 280 S.C. 138, 311 S.E.2d 717 (1984); *Chittenden Trust Co. v. King*, 143 Vt. 271, 465 A.2d 1100 (1983), with *Northeast Datacom, Inc. v. City of Wallingford*, 212 Conn. 639, 563 A.2d 688 (1989); *First Nat'l Bank of Springfield v. Department of Revenue*, 85 Ill.2d 84, 51 Ill.Dec. 667, 421 N.E.2d 175 (1981); *State v. Central Computer Services, Inc.*, 349 So.2d 1160 (Ala. 1977); *Honeywell Information Systems, Inc. v. Maricopa County*, 118 Ariz. 171, 575 P.2d 801 (1977). Thus, even if I were to conclude these state tax cases could provide some guidance—which one court has said they cannot because the UCC is different, see *Systems Design and Management Information, Inc. v. Kansas City Post Office Employees Credit Union*, 14 Kan.App.2d 266, 788 P.2d 878 (1990)— they do not come to any clear rule. Nor has there been any reported decisions since *Bedford* which deal with software as tangible or intangible under the UCC. Therefore, I will conclude that the source code should be considered a tangible good for present purposes.

Having decided that the software is a good, I am left with the remaining decision of whether it is an ordinary or mobile good. I am constrained to rule that it is an ordinary good because although the technology of the source code in one sense is "normally used in more than one jurisdiction" it is physically located in one place, and it is not "equipment or ... inventory leased". See NHRSA 382–A:9–103(3)(a). Source Code is much different than the typical mobile good, like a combine, see *Konkel v. Golden Plains Credit Union*, 778 P.2d 660 (Colo. 1989) (en banc), or an airplane.

### Ordinary Goods

NYSBVP first argues that the source code never left New York based on the bankruptcy schedule statement. However, something did leave New York and go to Pittsburgh. It may have been only a copy, but a tangible good did leave New York so the reprefection provision comes into play.

■ Assuming the source code did move, the debtor C Tek, who has the power of a trustee in bankruptcy, could not defeat NYSBVP's lien under section 544(a). This is because only a "purchaser" defeats a previously perfected lien under section 9103(a)(4)(i). As a lending treatise in this area explained:

Section 9–103(1)(d)(i) says that if one in Bank's shoes fails to reperfect in the removal state within the appropriate period, his "security interest becomes unperfected at the end of that period and is thereafter deemed to have been unperfected as against a person who became a *purchaser* after removal." The definition of "purchaser" under 1–201(32) and (33) would include another secured party and a nonordinary course buyer, but not a lien creditor, and hence not the trustee under Bankruptcy Code § 544.

White and Summers, *Uniform Commercial Code*, § 22–21, p. 1055–6 (1988). But see *In re Utah Agricorp, Inc.*, 12 B.R. 573, 577 (Bankr.D.Utah 1981).

■ The more difficult question is whether NYSBVP should be deemed unperfected against IIS. It must be remembered that section 1–102 of the Uniform Commercial Code states that the Code is to be "liberally construed and applied to promote its underlying purposes and policies." I believe a strict application of the four-month rule would produce a result demonstratively at odds with the purpose of the

provision. Fortunately, one state supreme court has recently ruled on facts similar to these that the four-month rule will not be enforced in order to realize its underlying policies.

In *First Nat'l Bank in Brookings v. John Deere Co.*, 409 N.W.2d 664 (S.D. 1987), the South Dakota Supreme Court was presented with a lender who had a first perfected lien on after-acquired property of the debtor. A tractor dealer then sold a tractor to the debtor with a subordinate security interest. The debtor defaulted on the tractor loan, so the dealer repossessed and took the property to another state. The lender did not reperfect within four months, but the court still gave it priority over the dealer. The court stated:

> The Uniform Commercial Code should be liberally construed and applied to promote its underlying purposes and policies. *See* U.C.C. Section 1–102. Give the circumstances of this case, *a close analysis of the purposes behind the four-month rule and the positions held by these parties is necessary. Applying this rule without such consideration could lead to a result not contemplated by the drafter of the Code.*
>
> The four-month grace period for continuation of perfection of a security interest in incoming goods was designed to protect creditors from absconding debtors. The intent of 9–103(1)(d) is to cover collateral brought into the second state. A secured party is allowed four months to find the debtor or collateral and to file in the new state. *See* 9–103(1)(d); 9–103(3)(e).
>
> Here, there was no absconding debtor involved in the removal, and no new value was given to an absconding debtor by a subsequent creditor. The facts in this case do not fit the familiar patterns of removal and subsequent purchase that the protection of the four-month rule was meant to cover.
>
> *We do not believe that local filing requirement* in MINN.STAT. § 336.9–103(1)(d) *was designed to govern*

*in this case* or intended to protect a party like Sterzinger, *who was not an innocent third-party purchaser after removal,* but was instead an original seller and secured party located in another state *who was involved before removal and who removed the collateral from the original state.* John Deere and Sterzinger were already perfected in South Dakota, and *their removal of the collateral across state lines merely placed Bank's perfected security interest in jeopardy.*

> *The policy behind the four-month rule* has been well stated:
>
> The fact that failing to act to preserve perfection makes the security interest "unperfected as against a person who becomes a purchaser after removal," indicates that protection of third persons in the second state is the objective. Manifestly, notice to them requires a filing in the second state as it would be unreasonable and impractical to charge them with knowledge of a filing in the first state, particularly when in many instances the third person in the second state would have no knowledge of the origin of the goods in the first state.
>
> *     *     *     *     *     *
>
> Thus John Deere and *Sterzinger had actual knowledge of Bank's security interest* at the time the equipment was sold in 1984 and well before the date of removal on May 6, 1985.
>
> Bank contacted both Sterzinger and John Deere and asserted its claim sometime shortly after May 21, 1985, and before Bank had turned the matter over to its attorney on June 7, 1985. *We believe it is significant that the bank asserted its rights within four months of removal. Id.* at 666–7 (emphasis added).

This case is markedly similar to the case before me. IIS is not an innocent creditor. Rather, it took a security interest in the source code with full knowledge of NYSBVP's rights. It was IIS, not C–Tek, that determined and decided that the goods would be moved to Pittsburgh.[2] NYSBVP

---

2. IIS was in complete control of the source code

upon execution of the Master Distribution

asserted its rights by Jones calling Oliver on about July 22, 1988, contemporaneously with the removal of the goods, trying to work out a deal to avoid foreclosure and thus clearly reasserting its secured rights in the goods. Also, the attorney for NYSBVP sent the August 10, 1988 letter to Chambers—then an employee of IIS who can be imputed with knowledge of its contents—which attempted to preserve its rights in its collateral before the expiration of the four-month period[3].

■ Another reported case has also looked to the policy of the four-month rule and refused to enforce the literal terms of the statute because it would produce a result at odds with its underlying policy. See *In re Automatic Bookbinding Serv., Inc.*, 471 F.2d 546 (4th Cir.1972). Indeed, the case law available suggests that when there is an absconding debtor and an innocent creditor in the second state the rule is literally applied, see, e.g., *Konkel v. Golden Plains Credit Union*, 778 P.2d 660 (Colo.1989) (en banc), but when those factors are not present the courts will consider the equities involved in construing the statute.

The Court is cognizant that in a recent opinion I stated the plain meaning rule should normally be applied to statutes. See *In re PSNH*, 108 B.R. 854 (Bankr. D.N.H.1989). However, the statute in this case is the Uniform Commercial Code which is to be "liberally construed and applied to promote its underlying purposes and policies." NHRSA 382–A:1–102. Moreover, there is an exception to the plain meaning rule when " 'the literal application of a statute will produce [a] result demonstrably at odds with the intention of its

drafters.' " *Id.* at 876 (quoting *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, ——, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290, 299 (1989)). This is such a case, particularly where IIS controlled the movement of the goods, IIS knew of NYSBVP's lien, NYSBVP asserted its rights within four months, and the deal IIS had leverage in negotiating allowed it to "walk away" at no cost if NYSBVP reperfected.

### General Intangibles

NHRSA 382–A:9–103(3)(e) says one who fails to reperfect in the new jurisdiction becomes unperfected as against a "purchaser". As previously discussed, however, section 544(a) cannot be used to deem NYSBVP an unsecured claim because the debtor, claiming the power of a trustee in bankruptcy, is not a purchaser. See White and Summers, *Uniform Commercial Code*, § 22–21 (1988).

■ Regardless, I believe NYSBVP would be deemed perfected as against any bankruptcy trustee and any other secured party, like IIS, because there was never "a change of the debtor's location" within the meaning of the statute when its purpose is examined. As previously discussed, a four-month rule is designed to protect innocent creditors who do business with an absconding debtor in the second state.[4] Yet, C Tek's existence in New Hampshire was such that it could not possibly attract any creditors in the second state. C Tek had "ceased day-to-day operations", and was operating merely as a conduit to pay creditors through royalties received. Finally, Chambers admitted he moved to Hanover for personal, not business reasons. Indeed, the only party who could benefit

---

Agreement, because of its terms and by the fact C Tek was essentially extinct and Chambers was now an employee of IIS. Chambers was not in the position legally or practically to decide whether the source code stayed at IIS's New York office or was moved to Pittsburgh.

**3.** It is also significant that IIS gave no "new value", like the defeated creditor in *First Nat'l Bank in Brookings v. John Deere Co.* IIS had no obligation to sell the software under the terms of the agreement. Indeed, it is quite possible IIS would have exercised its right to "walk

away" upon 30 days notice if NYSBVP had formally reperfected within four months.

**4.** The same reasoning involving the four-month rule for goods can be applied here to general intangibles. As a leading trustee stated:

Since this language resembles 9–103(1)(d)(i) on changes in location of collateral, changes in debtor's location can be analyzed like changes in the collateral's location.

White and Summers, *Uniform Commercial Code*, § 22–23, p. 1067 (1988).

from finding C Tek existed in New Hampshire is IIS who is far removed from the intended innocent third-party creditor the statute was designed to protect. Therefore, if I look at the purpose of this provision I believe C Tek never moved from New York.

In response, IIS points to subsection (3)(d) which states:

A debtor shall be deemed located at his place of business if he has one, at his chief executive office if he has more than one place of business, otherwise at his residence.

Thus, IIS argues that C Tek wasn't doing business but the "residence" of C Tek was in New Hampshire. Yet, it has been held that a corporation has its "residence" under this statute as its place designated in its Articles of Incorporation. See *In re Pub Dennis Int'l, Inc.*, 115 B.R. 16 (Bankr. D.R.I.1990) C Tek is a Delaware corporation, but there is no evidence where its Articles of Incorporation listed its residence, although a reasonable inference could be drawn that it was New York. Moreover, to say C Tek's residence was in New Hampshire does not conform to the purpose of the statute which is to protect innocent creditors in the second state. IIS should not be allowed to profit from using the software ClienTrak in knowing disregard of NYSBVP's security interest based on a literal application of the statute.

If NYSBVP had done nothing to preserve its interest C Tek and IIS might have a stronger point. But, the August 10th letter of NYSBVP's counsel clearly put C Tek and IIS on notice that NYSBVP was preserving its rights.

NYSBVP raises another ground for deeming its security interest perfected: that NYSBVP was misled about the new residence of C Tek until four months had passed so the doctrine of estoppel should be used to deem NYSBVP's security interests perfected. There is some evidence to support this position such as the July 19th letter which uses as an address for C Tek a P.O. Box in New York, and no other written correspondence by C Tek until December when it disclosed an address in Hano-ver, New Hampshire. Yet, the August 10th letter by the NYSBVP attorney refers to prior communications with Chambers, and the most reasonable inference is that at that time they knew where he was and he was claiming to be acting on behalf of C Tek. What they didn't know is that C Tek would later claim to be doing business to a degree that would invoke the four-month rule. But as discussed above, C Tek wasn't doing that type of business.

### Conclusion

The hardware and source code are "ordinary goods", while the copyrights are "general intangibles". NYSBVP has a perfected security interest in all of this collateral pursuant to its agreement with C Tek.

Jean Mauney Chambers, who essentially defaulted from these proceedings, has an unperfected security interest.